Story, Eq. Jur. §§ 899, 900; Cole v. Cunningham, 133 U. S. 107, 10 Sup. Ct. 269, 33 L. Ed. 538; Phelps v. McDonald, 99 U. S. 298, 25 L. Ed. 473; Vail v. Knapp, 49 Barb. 299, 305.

In the McDonald Case, supra, the court says:

"Where the necessary parties are before a court of equity, it is immaterial that the res of the controversy, whether it be real or personal property, is beyond the territorial jurisdiction of the tribunal. It has the power to compel the defendant to do all things necessary, according to the lex loci rei sitæ, which he could do voluntarily, to give full effect to the decree against him. Without regard to the situation of the subject-matter, such courts consider the equities between the parties, and decree in personam according to those equities, and enforce obedience to their decrees by process in personam."

So that, notwithstanding the facts that the quarry and some or much of the property of the copartnership are located in the state of Vermont, this court may and, under the exceptional circumstances of the case, should, so far as it can, compel defendant to comply with its orders. The cases cited by defendant (Montana Ore Co. v. B. & B. Co.; 44 App. Div. 136, 60 N. Y. Supp. 684; Johnstown Mining Co. v. B. & B. Co., 60 App. Div. 344, 70 N. Y. Supp. 257; White v. Caxton Book Binding Co., 10 Civ. Proc. 146; Atlantic & Pacific Tel. Co. v. B. & R. R., 46 Super. Ct. 377; and Matter of William H. Hughes Co., decided by Mr. Justice Henry T. Kellogg) did not involve the relations and conditions which exist in this case, and those were cases where efforts were made in the courts of this state to control the actions of courts or of officers of courts of sister states, after jurisdiction had been acquired by the latter.

The motion should be granted, with $10 costs.

---

(160 App. Div. 208)

WHITEHALL WATER POWER CO., Limited, et al. v. ATLANTIC, GULF & PACIFIC CO.

(Supreme Court, Appellate Division, Third Department.    January 21, 1914.)

1. WATERS AND WATER COURSES (§ 89*)—CREEKS—RIGHT TO BED—DEED BY COMMISSIONER OF FORFEITURES.

Where a patent issued to S. reserved Wood creek as a common highway, and where, upon the lands granted being subsequently forfeited to the state by attainder, and confiscated and sold, the deed executed by the commissioner of forfeitures under authority of Laws 1784, c. 64, authorizing him to dispose of land "heretofore confiscated and forfeited," erroneously included the bed of such creek, the grantee of the commissioner's deed did not take title to the bed of the creek; the commissioner having authority only to do what the statute authorized him to do, and subsequent statutes in ratification of his acts operating only to ratify his lawful acts.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 91, 92, 107; Dec. Dig. § 89.*]

2. ESTOPPEL (§ 62*)—ESTOPPEL AGAINST STATE—UNAUTHORIZED ACTS OF AGENT—PUBLIC LAND.

While the state may be estopped from claiming title to land by the enactment of statutes expressly recognizing title in another, it cannot be estopped by the unauthorized act of the commissioner of forfeitures in

including in a deed land which he has not been authorized by statute to convey.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 151–153; Dec. Dig. § 62.*]

3. TRESPASS (§ 25*)—ACQUIESCENCE—RIGHT TO RECOVER DAMAGES.

Where the owner of a dam located in a creek which the state contemplated improving without removing the dam, induced the state to change its plans so as to necessitate removal of the dam, it could not recover damages from a construction company, engaged in making the improvements under contract with the state, on the ground that its removal of the dam constituted a trespass.

[Ed. Note.—For other cases, see Trespass, Cent. Dig. §§ 54–57; Dec. Dig. § 25.*]

Appeal from Trial Term, Washington County.

Action by Whitehall Water Power Company, Limited, and another, against the Atlantic, Gulf & Pacific Company. From judgment for plaintiffs, defendant appeals. Reversed.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Russell H. Robbins, of New York City (Thomas Carmody, Atty. Gen., and Joseph A. Kellogg, of Glens Falls, and Wilber W. Chambers, of New York City, Deputy Attys. Gen., of counsel), for appellant.

Edgar T. Brackett, of Saratoga Springs (Benjamin P. Wheat and Luther A. Wait, both of Saratoga Springs, of counsel), for respondents.

HOWARD, J. In 1765 Philip Skene obtained from the crown of Great Britain the grant of about 25,000 acres of land lying in the northern part of what is now Washington county. The King in his royal patent made these reservations: "Excepting the said Wood creek which is reserved as a common highway for the benefit of the publick." Also: "Except Wood creek as aforesaid, for a common and publick highway." At or near the site of the falls in Wood creek, the Whitehall Water Power Company, Limited, and its predecessors in title, have, for many years, maintained a dam across the creek. This dam was destroyed in 1910 by the defendant herein, a foreign corporation pursuing the work of constructing a section of the Barge Canal under contract with the state of New York. Neither the dam nor the bed of the creek had been appropriated by the state at the time of the alleged trespass. There are two plaintiffs herein; but in speaking of the "plaintiff" I shall refer to the Whitehall Water Power Company, Limited, the alleged owner of the premises.

In Champlain Stone & Sand Co. v. State of N. Y., 142 App. Div. 94, 127 N. Y. Supp. 131, a case decided by this court and unanimously affirmed by the Court of Appeals, it was determined that the bed of Wood creek did not pass to the grantee by the "Artillery Patent," but was retained by the crown of Great Britain and, as a result of the Revolutionary War, became vested in the state of New York Again in Johnson v. State of New York, 151 App. Div. 361, 135

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

N. Y. Supp. 496, under this very "Skeeneborough Patent," the title to Wood creek was declared to be in the state.   These adjudications settle the law, and no further discussion as to the effect of the reservations in these patents is necessary.

[1] But even though the crown did retain title to the bed of the creek, which title afterwards came to the state, the plaintiff nevertheless claims to hold the title by a subsequent grant from the state.

Philip Skene was a Tory and a traitor.   His lands in the state of New York were forfeited by attainder, were confiscated, and sold. The commissioner of forfeitures who conducted the sale and executed the deeds derived his authority from chapter 64 of the Laws of 1784. That statute, so far as it confers authority upon the commissioner to sell, reads:

"That it shall be   *   *   *   lawful for the said commissioners   *   *   *   to sell and dispose of all lands tenements hereditaments and real estate,   *   *   * heretofore confiscated and forfeited to the people of this state.   *   *   * "

The deed which Webster, the commissioner, executed, undertook to, and so far as the form goes it did, convey a good, perfect, and complete title to the premises described.   So far as the statute authorized the conveyance of the lands described in the deed, the conveyance was perfect and the state warranted the title.   But the commissioner undertook, apparently, either purposely, or through ignorance or mistake, to convey Wood creek; and it is contended by the plaintiff that this conveyance gave to the grantee a good and perfect title to the bed of the stream.   The plaintiff's position is that Webster's deed, even though he was acting beyond the scope of his statutory authority, was valid and sufficient and was recognized as such by the state and confirmed by subsequent statutes.

The commissioner could only do that which the statute authorized him to do, and the subsequent ratification of his acts by statute was only a ratification of his lawful acts.   The state, if it had intended to do so, might have ratified and validated Webster's attempt to deed away the bed of Wood creek; but these statutes of ratification on which the plaintiff relies are general in their terms and expression. They do not specifically confirm the deed of Wood creek.   Therefore we must construe these confirmatory statutes as applying only to the authorized acts of Webster.   This construction is forced upon us by the further fact that specific statutes of the state (chapter 186, Laws 1801; chapter 47, Rev. Laws 1813; chapter 272, Laws 1879; chapter 683, Laws 1901) have continuously recognized Wood creek as the property of the state.   In the statute of 1801 the state declared Wood creek to be a public highway "to the falls."   If the plaintiff was only laying claim to the dam and the land immediately under it, there might be some force in its contention that the state intended to make it a public highway only to the falls, but not through and including the falls.   The plaintiff, however, claims not only the land immediately under the dam which was destroyed, but also the "falls, water and land," described in the Webster deed; that is, all that part of the bed of Wood creek included in the conveyance.   It is altogether improbable that the state would repeatedly declare this stream

to be a public highway and appropriate moneys to clean it out and make it passable as a public highway while acknowledging it to be the property of private owners. Our conclusion therefore is that Webster's deed of the premises in question did not divest the state of its title to the bed of Wood creek, and that no subsequent statute has operated to give it that effect.

[2] But the plaintiff further claims that the state is estopped from making any claim to the premises in question. We think this contention is unsound. That a sovereign state may, under certain circumstances, like an individual, be estopped, may be admitted. But the state can never be estopped by the unauthorized acts of its agents. People v. Ostrander, 144 App. Div. 860, 129 N. Y. Supp. 922; Wells v. Johnston, 171 N. Y. 324, 63 N. E. 1095; Miller v. Mayor of New York, 3 Hun, 35; Indiana Central Canal Co. v. State, 53 Ind. 575. The acts of the state itself—that is, the statutes relative to forfeited lands—might operate as an estoppel, were they intended to be confirmatory of Webster's unauthorized acts; but, as we have seen, they referred only to his lawful acts. No estoppel was pleaded by the plaintiff; but, assuming that the plaintiff could avail itself of the doctrine of estoppel without pleading it, yet, under the circumstances presented here, we hold that the state was not estopped.

[3] It is perhaps well to refer to the plaintiff's apparent consent to the alleged trespass. The evidence is rather meager on this subject and not altogether clear, but it appears that the original plans of the state did not contemplate a removal of the old dam. After a conversation between a representative of the state and a representative of the plaintiff, the plans were changed. In this conversation Mr. Meyer, speaking for the plaintiff, stated that, if the state gave him more head, he did not care whether they took out the old dam. The plans were then changed, and the defendant proceeded to remove the old dam without opposition from the plaintiff, and, indeed, in apparent complete harmony with the plaintiff, for an arrangement was made in writing between the parties whereby the defendant agreed to and did supply the plaintiff with electric power in the interim between the demolition of the old dam and the construction of the new one. It is true that the plaintiff in that agreement attempted to reserve all its legal rights; but it made no objection to the removal of the dam, and it could not, in fact, consistently object after having induced the change of plans by its previous consent. The plaintiff may have been under some misapprehension as to its legal rights; it may have supposed that the destruction of the property gave it a cause of action against the state. But as to the acts of this defendant, if the plaintiff gave its consent, it cannot now complain. Where there is acquiescence there can be no trespass. We do not, however, base our decision on this acquiescence, but on the failure of the plaintiff to establish its title to the premises in dispute.

The supply of water power to the plaintiff's mill has not been depleted, but greatly improved, by the destruction of the old dam and the erection of the new one. Neither has the state attempted to cut off the plaintiff from the use of this water power; it may, perhaps,

attempt to do so in the future. But no issue as to the prescriptive rights of the plaintiff in the waters of Wood creek is presented by this appeal, and we express no opinion on that subject.

The judgment should be reversed, with costs.

Judgment reversed, with costs. The findings of fact of which we disapprove are those numbered 8, 10, 11, 13, 14, 15, 16, 17, 18, 20, 21, 22, 23, 25, 26, 27, 28, 29, 31, 33, 34. In addition to the findings of fact of which we approve made by the trial court as disclosed in the decision and in the findings made at the request of the defendant we adopt as further findings of fact the requests of the defendant to find, as indicated in the record, and numbered 14, 15, 16, 18, 19, 22, 24, 27, 31, 33, 35, 36, 37, 38, 40, 41. All concur; KELLOGG, J., in result, in memorandum in which LYON, J., concurs.

JOHN M. KELLOGG, J. (concurring in result). I cannot agree that the plaintiff had no legal interest in the falls, the dam, and water power. It is true that the words "excepting Wood creek, which is reserved as a common highway for the benefit of the public," and the words "except Wood creek, as aforesaid, for a common and public highway," in the Artillery patent, are an exception and not a reservation and that the title to the bed of the creek did not pass thereby. Champlain Stone & Sand Co. v. State of New York, 142 App. Div. 94, 127 N. Y. Supp. 131, affirmed 205 N. Y. 539, 98 N. E. 1100.

In Johnston v. State, 151 App. Div. 361, 135 N. Y. Supp. 496, we applied that decision to this Skeeneborough patent. In those cases the interpretation of these clauses rested solely upon the patent itself and the fact that Wood creek flowed through the forest and was used as a common highway for the passage of canoes and rowboats.

Here the circumstances leading up to the patent and under which it was issued indicate clearly what the words forming the exception meant to the parties to it, with reference to the falls, the water power, the dam, and the bottom of the creek upon which it rested. Mere words in themselves have but little meaning; it is the circumstances under which they are used and the subject to which they refer that give them real meaning and force. An expression must be construed with reference to the time and the circumstances of its use.

Maj. Skeene, encouraged by Sir Jeffrey Amherst, Commander in Chief of His Majesty's forces in America, in 1760 undertook the establishment of a settlement at Wood creek, near the falls, and at great expense settled and maintained about 30 families there. During his absence on the expedition against Martinique and Havana, all of them except 15 abandoned the settlement. Upon his return in 1763 he memoralized the crown to grant him a patent of the settlement and surrounding lands, stating the efforts he had made, and, among other things, that he had established a sawmill at the falls. He entered into a bond conditioned that he would settle 30 families upon the premises within three years. The patent was granted, and in describing the lands refers to the sawmill built by him near the falls. He made the settlement as agreed. In attempting to establish a settlement in the wilderness, a sawmill was a most important consideration, for without

it lumber could not be obtained for building houses and accommodations for the people. In interpreting the grant with reference to the falls, the water power, and the dam, the question is: Did the crown intend to reserve the title to them in itself, or to grant it to Skeene? Did it mean to except from the grant the very foundation of the settlement, the only thing which made possible the success of the enterprise?

At the time of the patent, the falls in the creek and the water power and dam were very important for two reasons: (1) They obstructed the navigation of the creek so that the canoes and rowboats from Lake Champlain could only get into the creek by being carried around the falls. The falls had for all times preceding formed such an obstruction. The highway at the falls was not over the falls, but was the "carry" around them. While the falls made it necessary to carry the canoes and boats around them, the dam at the falls was a benefit to the navigation above, as it backed up the water in the shallow stream. (2) They gave power to the sawmill, and the sawmill made possible the settlement, and the establishment of a settlement was the reason which impelled the King to grant the patent. We therefore have the falls, the dam, the water power, and the mill as the things which made the success of the settlement possible. When the patent is laid upon the ground, it fits well around them, and gives life and meaning to the grant and the exceptions with reference to Wood creek. The falls are at the point, or just above the point, where Wood creek flows into Lake Champlain. The "Wood creek" which was excepted from the patent for the purposes of a public highway evidently was the creek above the falls which was used and was useful for navigation, and not the part used by Skeene in forwarding the enterprise which was the consideration of the patent and for which he desired it. The King desired Skeene to use the water power and the falls just as they were used at the time, and desired the public to make the same use of the creek it was then having. It was not in the mind of any one at that time that the place where the falls and dam were might possibly be used in navigation or as a part of a public highway. It is not necessary here to determine that the patent carried with it the bed of Wood creek at the falls and dam; it is manifest that it carried with it the right to maintain a dam at the falls and to use the waters of the creek at that place for mill purposes in connection with the settlement. In any event, it must be conceded that the situation was such that at least it presented reasonable grounds for the contention that the bed of Wood creek at the falls and the water power and dam were actually conveyed. Apparently it was not fair that the crown should reserve from the patent the only thing which would enable the patentee to make a success of the enterprise and to protect the surety on his bond. That the "Wood creek" excepted in the patent does not include the dam and the falls is evident by the subsequent acts of the Legislature declaring the part of Wood creek above the falls navigable waters. The designation of the part of the creek above the falls indicates that the dam, the falls, and the part of the creek below were not a public highway, perhaps because it was not then deemed possible that there could be an actual

navigation, and perhaps it was considered that the state had already conveyed away that part of the creek.

After Maj. Skeene was attainted of treason, the commissioner of forfeiture proceeded to sell the forfeited lands. After the most of them had been sold, he reported to Gov. Clinton a description of the unsold lands with an estimate of their value, among which we find, "Lot No. 23, 500 acres, with falls, equity of redemption, value supposed to be 6,000 pounds." Also, "Lot No. 24, 171 acres adjoining the falls, 400 pounds." Thereafter the 500 acres and the falls (a lot described as containing eight acres) were sold to the predecessors in title of the plaintiff for £2,750. The sale indicates that the commissioner estimated the property at about double its actual value. The 170 acres, next adjoining the 500 acres upon the creek above the falls, which he valued at £400, so far as appears, had no element affecting its value which made it less desirable than the 500-acre parcel without the falls. We must therefore assume that the 8 acres, including the falls, dam, and water power, represented the principal part of the purchase price, and that the state of New York actually received from the plaintiffs' grantor, on account of them, from $8,000 to $10,000. There were at least good and substantial reasons why the falls, the dam, and water power should have been included in the patent, and why the patentee might well claim that they were. After the state had sold the land to the plaintiffs' predecessor in title, chapter 52 of the Laws of 1797 was passed. It recited that the title deeds and other documents relating to forfeited estates were generally carried away by the former proprietors, whose conduct caused their forfeiture, and that the title of the state, as resulted from such forfeitures, is thereby peculiarly liable to be obscured or defeated. Therefore it enacted that no person or persons, bodies politic or corporate, who shall have any estate, right of claim in any of the lands "supposed to have been forfeited," and which have been heretofore granted by the commissioner of forfeitures, shall after five years prosecute any action for recovery against the right or title so granted by the state.

It is clear that the commissioner of forfeiture and the purchaser from him "supposed" that the falls, dam, and water power were forfeited, and on account of such supposition the commissioner exacted, and the purchaser paid the state, $8,000 or $10,000 for a conveyance of them. We cannot say what deeds and documents relating to this property may have been carried away by Maj. Skeene. Under such circumstances, when the purchaser and his successors in title have been in possession ever since, using the falls and dam and water power for mill purposes without any practical interruption, the state is not in a position to claim that the purchaser did not acquire the title. The claim now made that the commissioner had no authority to deed the falls is purely technical, and the state cannot be heard in making such a claim so long as it retains the money which it received for them. It is to be observed that the conveyance of the falls, carrying with it the dam and water power, did not and could not interfere with the navigation of the river as it then existed and as the future seemed to indicate such navigation might continue.

If we were dealing with a large river capable of navigation, as we understand the term, and not with a little creek about 10 to 20 feet wide and perhaps 6 inches to 3 feet deep in places, we might say that a grant of the creek was subject to a right of the public to navigate it, and that therefore the plaintiff would not have an absolute unqualified title to the falls and the place where his dam had stood for so many years. But if we assume that the same rule applies to this little stream, the plaintiff's situation is not materially changed. They at least acquired the right to use the falls and water power and maintain their dam for the purposes for which they were using them, subject, however, to the right of the state to use the creek as a public highway. This did not authorize the state to divert the waters from the creek or to destroy the dam. The canal itself, which now forms the public highway at this place, does not go through the creek, the dam, or the falls, but alongside of them, substantially replacing for the purpose of navigation the old "carry." Their destruction was not necessary for the purpose of navigating the creek, but resulted from the fact that the state deemed it desirable to erect a new dam in place of the old one for water storage and as a convenience.

We have considered the various elements going to make up the right of the plaintiffs to maintain a dam at this place. It is unnecessary to determine, and we will not determine, the exact nature of plaintiffs' rights. It is sufficient to say that they had a right to maintain a dam there and use the water for their power purposes.

Up to the time the action was brought the state had done no act in derogation of the plaintiff's rights. It destroyed their dam and water power, but erected a larger dam and gave them a better water power. This was done with their consent, although they protested against the actual work which had been invited by them, in order to save their legal rights. Undoubtedly the persons who were representing the state when the plaintiffs consented to a change of the plan of the canal which involved a destruction of the old dam and the building of a better one which would furnish a better head were not acting with such an authority that they could bind the state thereby. But apparently the state has ratified their acts and has built the new dam and furnished the water power as suggested. If it were not for a subsequent condemnation of the dam site, it would seem clear that the plaintiffs have suffered no harm. It is urged that their property interest in the dam is destroyed, and that, while having a present use of the water, they may be deprived of that use at any time. Upon consideration it seems that this suggestion is without force. It is known to be the policy of the state to rebuild bridges to take the place of those destroyed in the making of the canal; where a water power is interfered with, to replace it as far as practicable. The Barge Canal is not a temporary structure, but represents the permanent and fixed policy of the state. The dam and the structures furnishing water to the plaintiffs' mill are not temporary arrangements, but are intended to cover the future, and are in fact a continuation of the rights which the plaintiffs have always had to use the water of the creek for power purposes. Undoubtedly the map filed and served by the state appropriating the lands, and plain-

tiffs' riparian rights, must be construed with reference to the fact that the state at the time was making a permanent arrangement by which the plaintiffs should continue to receive from the canal a water power equal to or greater than that which the creek had furnished. The plaintiffs' damages for the appropriation would have been assessed upon that basis. The rights the plaintiffs now enjoy were not conferred upon them by the state when it was building the Barge Canal, but are the rights which were acquired by Maj. Skeene and by the conveyance from the commissioner of forfeiture, and their continued use. The condemnation by the state changed somewhat the form and manner of their use, but not to the plaintiffs' detriment. The present rights are in continuation of and in substitution for the rights which the plaintiffs always had. They may therefore demand as of right the continuance of the power now furnished them. I favor an affirmance upon the ground, not that the plaintiffs had no right in the dam and water power destroyed, but upon the ground that nothing of substance has been taken from them and they have suffered no loss.