# 188

GEORGE S. VAN SCHAICK, Superintendent of Insurance of the State of New York, as Rehabilitator of BOND AND MORTGAGE GUARANTEE COMPANY, Respondent, v. TITLE GUARANTEE AND TRUST COMPANY, Appellant.

Second Department, July 8, 1937.

190

*Graham Sumner* [*Clifford P. Case* and *Horace J. McAfee* with him on the brief], for the appellant.

*Charles E. Hughes, Jr.* [*Curtiss E. Frank* and *John R. McCullough* with him on the brief], for the respondent.

HAGARTY, J. This action is brought by the Superintendent of Insurance, in his capacity as rehabilitator of the Bond and Mortgage Guarantee Company, which company shall hereinafter be referred to as the mortgage company. The defendant, to which reference will be made as the title company, was a creditor of the mortgage company on the 13th day of March, 1933, in the sum of $2,300,000. The debt was unsecured. On that day the indebtedness was reduced by payment of the sum of $50,000, and the mort-

gage company gave to the title company a demand note for the balance, $2,250,000, secured by mortgages of an aggregate face value of $3,229,250. On the 8th day of June, 1933, the indebtedness was further reduced by payment of the sum of $250,000, and mortgages of the face value of $358,750 were returned to the mortgage company, leaving in the hands of the title company mortgages in the aggregate sum of $2,870,500 to secure the remaining indebtedness, amounting to the sum of $2,000,000. The demand note provided for a lien on moneys deposited with the title company by the mortgage company.

On the 2d day of August, 1933, the mortgage company and the title company entered into an agreement by which, in effect, the mortgage company turned over to the title company, as additional collateral for the note of March 13, 1933, all of the capital stock of three of its subsiduary corporations. Most of the mortgages which had been pledged were on properties, title to which was held by the mortgage company through the medium of these subsidiaries. The purpose of turning over the capital stock of these corporations, as evidenced by the fact that the subsidiaries were stripped of all other assets, was to enable the title company to take title to the real property mortgaged, if the need arose, thus saving the expense and inconvenience of foreclosure. In turn, the title company extended the time for payment of the indebtedness to February 2, 1934, and released the deposits of the mortgage company from the lien created by the note.

The judgment orders the title company to forthwith deliver and reassign to the plaintiff all the bonds and mortgages delivered to it by the mortgage company on the 13th of March, 1933, and also the stock of the subsidiary corporations; it also directs the payment, or repayment, of the $50,000 paid by the mortgage company on the thirteenth of March, as well as the $250,000 paid by the mortgage company on the eighth of June, and, in lieu of stocks and mortgages, the proceeds thereof or substitutions therefor.

It is the contention of the respondent that the payments and pledges on account of the indebtedness were illegal and void under section 15 of the Stock Corporation Law, section 276 of the Debtor and Creditor Law, and section 418 of the Insurance Law.

The second sentence of section 15 of the Stock Corporation Law, in so far as it is pertinent to this action, reads: " No conveyance, assignment or transfer of any property of any such corporation by it or by any officer, director or stockholder thereof, nor any payment made, judgment suffered, lien created or security given by it or by any officer, director or stockholder when the corporation is insolvent or its insolvency is imminent, with the intent of giving

a preference to any particular creditor over other creditors of the corporation, shall be valid, except as to any rights or interests which may be acquired thereunder by any person without notice or reasonable cause to believe that such conveyance, assignment, transfer, payment, judgment, lien or security would effect a preference."

It will be observed that, in order to set aside a conveyance or transfer under this provision, it must appear that the corporation making the transfer or assignment was insolvent, or, to quote from the statute, " its insolvency is imminent " at the time; that the transaction was accomplished with the intention of giving a preference, and that the recipient was not without notice or reasonable cause to believe that a preference was thereby effected in its favor.  Of these three elements, the all-important one in this case is the question of the solvency or insolvency of the mortgage company or whether or not its insolvency was imminent at the time of the transfer.  Owing to the dovetailed relationship of the mortgage company and the title company, as the result of which the title company audited the mortgage company's accounts, assuming that the requisite showing with respect to insolvency was established, I think that the elements of intent and knowledge were amply proved.

Inasmuch as the initial transaction which resulted in the pledge took place on the 13th of March, 1933, the major issue is whether the mortgage company was insolvent, or its insolvency was imminent, on that date.

There is no dispute as to the relationship between the mortgage and title companies, nor as to the nature of the business in which they were jointly interested.  The title company offered for sale, and sold to the public, first mortgages and certificates representing participating interests in first mortgages, with the payment of principal and interest guaranteed by the mortgage company. The payment of mortgages by the mortgage company was guaranteed in this language: " Payment of the principal, and of every installment thereof, as soon as collected, but in no event later than eighteen months after it shall have become due and payment thereof shall have been demanded in writing by the insured, with regular payment meantime of interest at the rate guaranteed." The respondent contends that the mortgage company's obligation, under this guaranty, matured after eighteen months from the time when the principal became due and payable, and that the company was then obligated to make payment, upon demand.  The appellant claims that the eighteen months' period did not begin to run

until the principal became due and a demand for payment thereof had been made upon the mortgage company. While this provision is somewhat ambiguous, it seems to be reasonably clear that the grace period of eighteen months was to run, not from the time of the demand, but from the time the principal became due and payable, and that after eighteen months had so expired, all that was necessary to perfect the obligation of the company was a demand by the holder of the guaranty. It will be observed that as to certificates representing participating interests in mortgages, the company's form contained the following: " While the bond secured by the mortgage mentioned in this certificate is payable by its terms on its due date, the policy of the Bond and Mortgage Guarantee Company, entitles it at its option to a period of eighteen months thereafter in which to collect the principal." This is the company's own construction of its guaranty. No reference whatsoever is made to the demand, much less that the eighteen months' period began to run only from the time of the making of such a demand. In any event, the guaranty was that of the company, and its ambiguity, whether intentionally created or not, should be construed against it.

It appears without dispute that, on the 28th day of February, 1933, the mortgage company was the guarantor of payment of principal and interest of mortgages, as distinguished from certificates, in the principal amount of $585,870,926, and of certificates outstanding in the principal amount of $332,095,283, or, in the aggregate, $917,966,209. Of these mortgages, $220,036,921.97 matured by their terms after February of 1933, but during the year 1933, and $202,218,201.06 had maturity dates in the year 1934. Of mortgages guaranteed, $66,793,003.54 in principal had matured prior to February 28, 1933, and of these, $1,179,650 had matured more than eighteen months prior to that date. Demand had been made for payment of $17,936.900 of such mortgages, but the eighteen months' period had not elapsed. On March 13, 1933, $11,331,141.26 of certificates had matured, and demand had been made for payment. On February 28, 1933, guaranteed mortgages under foreclosure were in the principal sum of $43,177,746.86, and mortgages in arrears for interest for more than thirty days, upon which, however, foreclosure proceedings had not been commenced, amounted to $129,421,489.05. Moreover, the mortgage company faced the prospect of paying guaranteed interest in the sum of $23,212,634.86 for the months of April, May, June and July of 1933, of which, however, one-twelfth or one-half of one per cent belonged to it as its premium.

The balance sheet of the mortgage company, as of March 13, 1933, showed capital, surplus and undivided profits listed in the sum of $22,770,612.

Naturally, long prior to March 13, 1933, both the mortgage company and the title company had felt the force of the depression. As to the mortgage company, directors' fees, salaries of employees and dividends had been reduced, an arrears department established to give special attention to mortgages in default, the practice of redeeming mortgage certificates on the due date was discontinued, and efforts were made to reduce the interest rate and to liquidate mortgages by selling them to banks. On the sixth day of March, 1933, all banks were closed pursuant to presidential proclamation. On the following day the Superintendents of Banks and Insurance were granted emergency powers to act in the public interest, and the presidential proclamation was construed to apply to mortgage loan companies. On March 8, 1933, one of the executives of the mortgage company advised the president of the title company that he did not believe that the mortgage company could pay its interest due on April first. Representatives of the mortgage companies conferred with the Superintendent of Insurance on March eighth, ninth and tenth, with respect to proposals designed to aid the mortgage companies.

This was the situation at the time the finance committee of the title company met, on the ninth day of March, and decided "that the demand loans of the Bond and Mortgage Guarantee Company be changed to a collateral loan secured by satisfactory first mortgages sufficient in amount to afford a margin of at least 20%." Although there is here some dispute between the parties as to whether or not the work of preparing bonds and mortgages on properties, title to which was in the subsidiaries of the mortgage company, was done under the supervision of the title company or of the mortgage company itself, the proof seems to bear out the respondent's contention that it was the title company which took charge of, and arranged for, the creation of these securities and their assignment, and that the mortgage company officials simply executed the necessary instruments as directed by the title company's representatives. In any event, it is clear that the mortgage company was created at the instance of the title company and that, at all times, the relationship between the companies was close.

The work of collateralization continued through Saturday and Sunday, the eleventh and twelfth days of March. The mortgages thus pledged by the mortgage company to the title company, in this transaction, amounted in all to the face value of $2,809,250, while the remaining $420,000 of mortgages pledged had been made

by property owners, unrelated to the parties, and were held by the mortgage company in due course.

It has been the practice of the title company, over the years, to lend to the mortgage company, on the first day of each month, moneys with which to meet obligations due under guaranties. But these loans, until late in 1932, were ordinarily repaid prior to the end of each month. It was also the custom of the mortgage company, for many years prior to March 13, 1933, to maintain deposit accounts with the title company, and to deposit in such accounts the moneys which it collected in the ordinary course of business.

On March 13, 1933, the title company held three demand notes of the mortgage company for moneys borrowed at the beginning of January, February and March, 1933, aggregating an unpaid amount of $2,300,000. This represented moneys borrowed from the title company for the purpose of paying, to the holders of guaranties, interest which was due on those dates. The collateralization of this loan, in the manner stated, was the first time in the relationship of the two companies, dating back to 1892, that such loans had been thus secured, although in some previous instances, where the title company had loaned more than $3,000,000 to the mortgage company, the excess over $3,000,000 was protected by collateral, inasmuch as the title company was not permitted to make unsecured loans in excess of $3,000,000.

On March 13, 1933, at six o'clock in the morning, the title company received from the Superintendent of Banks a telegram informing it that it might reopen. The collateral note of the mortgage company was received at about noontime. At five o'clock in the afternoon of that day, the mortgage company received from the Superintendent of Insurance a telegram informing it that the presidential proclamation was applicable to it, and that it could not continue operations except under the provisions of the executive order of the President, made March 10, 1933. Under the provisions of this executive order, reopening required the approval of State officials. On March 15, 1933, the mortgage companies, inclusive of the mortgage company here, were permitted to reopen under rules and regulations of the Superintendent of Insurance. The rules and regulations included one to the effect that there was to be no payment on guaranties except of such moneys as were actually collected from mortgagors.

On June 8, 1933, the mortgage company, while operating under these rules and regulations, paid to the title company the sum of $250,000 in reduction of the principal indebtedness, and the title company returned part of the collateral, as stated. This trans-

action was approved by the plaintiff, as Superintendent of Insurance, but the claim here is that such approval was " upon the facts submitted " in a letter applying for approval, and that the Superintendent was not informed, and did not know, that collateral had been pledged to secure an antecedent debt, or the facts which indicated that the collateralization of the loan on March thirteenth was preferential and that it should be set aside.

On the 2d day of August, 1933, the mortgage company and the title company entered into the agreement above mentioned, to provide additional collateral, on the one hand, and to release deposits from the lien of the title company, on the other. On that day the plaintiff Superintendent submitted for judicial approval a plan of rehabilitation of the mortgage company, which plan provided for the organization of a new corporation. The plan of rehabilitation was approved by order of the Supreme Court made on that day and, in addition and upon the petition of the Superintendent, the Superintendent was authorized to approve and carry out the terms and conditions of the agreement entered into between the companies, inasmuch as it appeared that the release of the mortgage company moneys on deposit with the title company was essential to the fulfillment of the plan of reorganization.

The assets which the mortgage company had as of March 13, 1933, with which to meet its obligations, according to its balance sheet as of that date, were cash on hand in the sum of $573,198.93, stocks and bonds of the face value of $2,085,137.28, bonds and mortgages in the sum of $12,201,336.55, real estate of the claimed value of $13,184,091.03, accrued interest in the sum of $7,157,518.26, and accounts and notes receivable in the sum of $105,537.77, making a total of $35,306,819.82.

Analyzed, however, as I read this maze of figures, we find that, of the cash on hand, but $234,279.53 was free money, that is, money exclusive of funds held in trust or agency by the company. The market value of the stocks and bonds was $469,712.50. Of the bonds and mortgages held, $9,389,236.33 were first mortgages, $6,458,686.33 of them were in default, and $1,048,790.17 were under foreclosure. The bulk of the mortgages which were not in default were turned over to the title company under the pledge transaction. Aside from subordinate interests, second mortgages and building loans, the remainder of the bonds and mortgages, in the sum of approximately $900,000, consisted of first mortgage certificates which, it is undisputed, had been redeemed by the company under its guaranty, resulting from the default of the mortgagor. The respondent urges that these assets, referring

to the mortgages, "obviously * * * could not have been sold except at a heavy discount." While undoubtedly that is true, and despite the shown weaknesses of these mortgages, no proof was adduced by the respondent as to their actual market value, and, for the purposes of this case, I shall assume that they were worth their face value. As to the real estate, it is conceded that it was acquired as the result of foreclosure, and the great increase in such holdings by the mortgage company, necessitated by foreclosures, appears from the fact that on December 31, 1929, that company held real property of the value of but $211,281.26, which in the intervening time it increased to the figures above stated. As to the method of valuation of the real estate held, it appears that it is determined by the amount of the mortgages foreclosed, plus expenses and taxes. While this method is most unsatisfactory, the parties seem to be in accord that there was a net value of the equity, over and above the mortgages incumbering the property, of $4,466,091.93. Of this, approximately $1,700,000 consisted of so-called equity remaining in properties subject to mortgages held by subsidiaries of the mortgage company and by those whom we may call "outsiders." Moreover, it is clear that, as of March 13, 1933, the company was faced with the prospect of taking a very great amount of property in exchange for its payment under the guaranty in the months to come. From December, 1928, to March, 1933, the real estate holdings had increased from one per cent of the total assets to approximately twenty-five per cent. Guaranteed mortgages in foreclosure in principal amount had grown from approximately $12,000,000, at the end of 1931, to approximately $43,000,000, at the end of 1933, and guaranteed mortgages in default, upon which foreclosure had not been commenced, had risen from $22,000,000, at the end of 1931, to more than $129,000,000, at the end of February, 1933. As to the item of accrued interest, it may be divided into three parts: *First*, $5,998,218.48 was interest overdue from mortgagors which had been advanced to policyholders; *second*, $628,387.08 was interest which had been advanced by the mortgage company, but was not yet due, and *third*, $530,912.70 was interest overdue on company-owned mortgages. The aggregate shows that of nearly $6,000,000 overdue and advanced, almost $5,000,000 had been overdue for two months or longer. The item of accrued interest had grown from the sum of $1,250,000 on December 31, 1929, to the figure above stated, on the 13th of March, 1933. Accepting the remaining item of assets under the heading of "Accounts and notes receivable" at the figure stated, we may consider the asset of accrued interest in conjunction with the company's obligation

under its guaranty to pay interest, which obligation was in excess of $50,000,000 a year, and its obligations for the four months of April to July, inclusive, of 1933, were $23,212,634.86, but one-twelfth of which the company was entitled to retain as its premium.

But, despite the strong trend toward increasing delinquency in payment of interest, the appellant points to the fact that during the months of January and February, 1933, it collected interest currently due, as well as part of the accrued interest, in an amount more than sufficient to pay its obligations for interest due during those two months. During those months it had collected interest in arrears in the sum of $1,668,342.09, interest due in January of $4,563,359.41, and interest due in February of $912,806.82, making a total of $7,144,508.32. On the other hand, it was obligated to pay current interest during those months of $7,562,103.16, but to retain therefrom one-twelfth or $630,175.26, leaving a net obligation of $6,931,927.90. Of course, if the company could build up a very large reserve of accrued interest, payments thereof, even though relatively small in proportion, would help in carrying current interest. But the delinquency was steadily mounting, and in percentages, the interest collected within thirty days in March, 1933, was only 56.99 per cent as compared with 82.12 per cent in January of 1932.

Respondent contends that the only reason why current collections of interest, together with collections of accrued interest, balanced the obligation for the months of January and February, 1933, was because they were light months, or, rather, that February was a light month. The interest due in these two months aggregated approximately $7,500,000. But interest due in April was $6,438,182.14, in May, $6,063,843.87, in June, $5,253,612.35, and in July, $5,456,996.50.

Appellant seeks to show that by combining collections from accrued interest with collections of current interest it could have met its interest obligations during this period from April to July inclusive. Deducting the premium due the company, there was payable for these months an interest obligation of aproximately $21,500,000. But even if it is accredited with the full amount of $1,527,437.43 which it claims to have had on hand as of March 31, 1933, after operation for a half month under plaintiff's restrictions, and collections in the sum of $18,412,592.91 made during the period from April to July, there is still approximately a difference of $1,500,000. In an endeavor to account for this, the appellant points to the releases from its guaranty given to the company by policyholders. But, of course, these releases, as to the nature of which there is no showing, a vital factor (*Matter of People [Law-*

*yers Title & Guar. Co.*], 265 N. Y. 20), could not have been considered by the company as of March 13, 1933, the date as to which the imminence of its insolvency must be reckoned, for the proof is that the releases came into being after March 15, 1933. Nor is there any showing that no part of the interest collected related to mortgages so released. Nor was the cash on hand, even assuming that it was not to be devoted in part to agency accounts, available in its entirety for the payment of interest. The operating expenses of the company's real estate were in excess of income; there were expenses incident to foreclosure proceedings to be met, and overhead of the company itself during this period of four months would have amounted to at least $600,000.

My conclusion on this phase of the case is that, as the situation was viewed as of March thirteenth, the probabilities were that the interest obligations could not be met for the ensuing four months. As a matter of fact, the actual balance sheet of the company as of July 15, 1933, shows that between that date and the preceding March thirteenth, $6,973,890.46 of interest remained unpaid, exclusive of the premium due the company. The cash on hand as of that time was $1,460,717.72. Even if appellant's contentions with respect to availability of undivided profits and premiums out of cash held in trust and interest to be collected for the last half of the month of July be accepted, it appears that there would still be a deficit of nearly $2,500,000.

To summarize the financial position of the mortgage company thus far as of March 13, 1933, we have no trouble with the cash surplus of $234,279.53 of free moneys and market value of stocks and bonds in the sum of $469,712.50. Accepting the mortgage assets at face value, despite their infirmities, because of lack of proof of market value, but bearing in mind that $3,229,250 thereof had been pledged, we have a balance of such assets in the sum of $8,972,086.55. Again with respect to real estate holdings, there is no proof of actual market value, and the equities over and above incumbrances are based, not upon value, but upon the amount of the incumbrances plus foreclosure expenses and taxes. The more expensive to foreclose and the greater arrearage in taxes, the more valuable the property, according to this method. But appellant acquiesces, and in fact urges that the real estate be accorded face value, in accordance with this method, in the sum of $4,466,091.03. There is another item of accounts and notes receivable in the sum of $105,537.77, which must be accepted at face value. This leaves the item of accrued interest in the sum of $7,157,518.26.

I have segregated the last item, that is, accrued interest, and have considered it with respect to the closely related subject of the mortgage company's obligations to pay interest during the succeeding four months. My conclusion with respect to interest is that the mortgage company could reasonably have anticipated inability to meet interest obligations in that period from accrued and current interest to the extent of $2,500,000 to $3,000,000.

Taking the other assets in the sum of approximately $14,000,000, and deducting a shortage arising from the interest obligation, there would be left an aggregate of approximately $11,000,000. To be deducted also were the office expense, operation losses and foreclosure expenses. It is difficult, if not impossible, to approximate these items.

Next we have the mortgage company's obligations under its guaranties of the principal of mortgages and certificates. In accordance with the adopted construction of the eighteen months' clause, it appears that the period was running with respect to an aggregate amount of $78,204,744.80. At the end of February, 1932, the amount of guaranteed mortgages, as to which principal had been demanded by purchasers although the eighteen months' period had not expired, was $1,698,575 of whole mortgages, and that amount cumulatively increased to $17,936,900 at the end of February, 1933. In addition, other whole mortgages as to which there had been as yet no demand, in the sum of $48,936,703.54 had matured at the end of February, 1933. Of these mortgages, $1,179,650 in principal amount had matured more than eighteen months prior to February, 1933, being thus payable upon demand.

As to certificates, $11,331,141.26 had matured, demand for payment had been made, and the eighteen months' period was running. The obligation in this respect shows payments of an average of $100,000 a month from January, 1933, to January, 1934, and thereafter the obligation veered upward so that the company faced the prospect of paying $2,757,434 of certificates in July, 1934. With respect to whole mortgages, it appears that, commencing with August, 1933, the company's difficulties would become stringent, with obligations approximately of $1,700,000 which had to be paid, and veering upwards sharply thereafter. Of course, the mortgage was the primary source of payment, but the mounting foreclosures indicate the heavy obligations of the company to make payments in cash and take over the property.

So, as I see it, the company faced the prospect of paying heavy demands until August of 1933, after which time the demands would become staggering, and the assets of approximately $11,000,000 were wholly inadequate.

Thus, accrediting the company's obligations on the basis of face value rather than liquidity, its ability to raise cash by means of the proposed plan of the Realty Stabilization Corporation is immaterial. The proof shows that the reliance upon that corporation was nothing more than a hope, which was dissipated by failure prior to March 13, 1933.

The second of the three elements necessary to establish an unlawful preference under the second sentence of section 15 of the Stock Corporation Law is a showing of intent on the part of the mortgage company to prefer the title company over other creditors. Of course, if the transfer was made as an incident to the conduct of the business, with the expectation of carrying on, as distinguished from making a preferential payment to one creditor, with insolvency in sight, the transfer would not be unlawful. (*Curtis* v. *Leavitt*, 15 N. Y. 9, 108.) But when the debtor pays one of his creditors at a time of financial stress, with the hope that the storm will be weathered, but, in any event, with the purpose of seeing to it that that particular creditor is paid if the worst happen — which, I think, may fairly be said to be the situation here — then the intent to prefer is present. (*Dalziel* v. *Rosenfeld*, 265 N. Y. 76, 80.) Although the appellant urges that the reason for the collateralization was to present a sound picture of the title company's financial position in order that it might be granted speedy permission to reopen, the hurried nature of the transaction with full knowledge of all concerned of the precarious situation of the mortgage company, the intertwined relationship of the two companies, the continuance and completion of the transfer after the title company had been permitted to reopen, and the acts of some of the individual officers of both companies in liquidating their holdings in the mortgage company for themselves or those in whom they were interested, lay the basis for a holding that an intent to prefer was present.

As to the third element to be taken into consideration, namely, notice or reasonable cause to believe that the transfer effected a preference on the part of the transferee, little need be said, as the title company knew as much about the mortgage company's affairs as did the latter itself.

The third sentence of section 15 of the Stock Corporation Law reads: " No corporation formed under or subject to the Banking, Insurance or Railroad Law shall make any assignment in contemplation of insolvency." Undoubtedly, this special provision with reference to these corporations, in which the public interest is so directly involved, was intended to place even more stringent restrictions upon assignments in the event of insolvency. The

effect of this sentence, in my opinion, is to dispense with the elements of intent and notice, which must be established under the second sentence of section 15. The appellant endeavors to read into this sentence the word " general " before the word " assignment," and argues that the legislative purpose was to prevent such corporations from voluntarily liquidating themselves in an informal manner. I am of opinion, however, that we must accept the provision as it is written. (*Robinson* v. *Bank of Attica*, 21 N. Y. 406.) The applicability of this sentence, however, merely serves to accentuate the importance of the issue of imminence of insolvency.

The first sentence of section 15 of the Stock Corporation Law reads: " No corporation which shall have refused to pay any of its notes or other obligations, when due, in lawful money of the United States, nor any of its officers or directors, shall transfer any of its property to any of its officers, directors or stockholders, directly or indirectly, for the payment of any debt, or upon any other consideration than the full value of the property paid in cash."

It is conceded that defendant was a stockholder of the mortgage company, and respondent invokes this sentence for the purpose of dispensing with the necessity of showing imminence of insolvency. I am of opinion, however, that the showing was insufficient to warrant this judgment under this sentence for the reason that the record does not bear out the contention that the mortgage company refused to pay obligations when due. The specific obligations invoked amounted to $20,000. The mortgages constituting those obligations fell due between the 1st and 9th days of March, 1933, at a time when conditions generally were in a state of utmost confusion, and the proof shows no irrevocable refusal to pay up to the time the transfer was made. Finding of fact numbered eighteen, therefore, should be reversed.

The trial court also found that the pledge of these mortgages violated section 276 of the Debtor and Creditor Law. (Findings 20, 24, 29, and Conclusion 2.) I am of opinion that the findings and conclusion were erroneous in that the Debtor and Creditor Law has no application to the transaction in question. The validity of the indebtedness of $2,300,000 is unquestioned, and the pledge was not inordinately large. Although the transaction was preferential in nature, it was not fraudulent.

The appellant also argues that it is entitled to retain the sum of $50,000 by which the indebtedness was reduced on March 13, 1933, by way of exercise of its banker's lien upon moneys on deposit with it by its debtor, the mortgage company. There is no question

that at the time the mortgage company had on deposit with the title company free moneys in excess of $50,000. If the payment was a voluntary one by the mortgage company, the respondent argues, then it was in the same category as the pledge of the mortgages. On the other hand, if the title company asserted its lien and took the money, then, in my opinion, the question of preference as to this $50,000 is not present.

I am of opinion that the title company was entitled to assert its banker's lien to the full amount of the free moneys of the mortgage company deposited with it, for the notes representing the indebtedness were demand notes and the indebtedness itself was valid. There is no question that the moneys on deposit were there as the result of years of custom and had not been placed with the title company for the purpose of enabling the latter to assert a banker's lien thereon. The findings are contradictory in this respect as in some of them the reduction of the indebtedness by $50,000 is characterized as a payment (Findings 13, 14, 15 and 20) whereas in one the reduction is characterized as a charge (Finding 66). It would seem that it was actually a charge, inasmuch as Rockwell, the title company's representative, accepted the new note, reduced in amount by $50,000 and charged off the old notes to the mortgage company's account, although the determination of the finance committee of the title company as of March ninth was simply to compel collateralization of the existing indebtedness.

But, even though this deduction of $50,000 constituted a "payment" by the mortgage company rather than a "charge" made by defendant, I am of opinion that it must, nevertheless, be regarded as if it were an exercise of the title company's right to offset. The debt was genuine and the money was there. As in *Studley* v. *Boylston Nat. Bank* (229 U. S. 523), the transaction was "a book entry equivalent to the voluntary exercise by the parties of the right of set-off." In *Lane & Son* v. *County of Westchester* (248 N. Y. 298) the right to a lien had not been perfected, and so the authority of that holding is inapplicable.

The same contention is made by appellant with respect to the transaction of June 8, 1933, whereby $250,000 was paid by the mortgage company on account of the indebtedness. The findings with respect to this transaction are also contradictory. It was found that the deposits of moneys by the mortgage company with the defendant from March 13, 1933, through August 1, 1933, were never consented to or approved by the Superintendent of Insurance; that such deposits were made with the intent of preferring the title company, in contemplation of insolvency, and that the deposits

were made to defraud creditors. Thus it was found that the transaction was in violation of section 15 of the Stock Corporation Law, section 276 of the Debtor and Creditor Law, and section 418 of the Insurance Law. In my opinion, section 276 of the Debtor and Creditor Law is without application and, of course, irrespective of the question of impending insolvency and intent, the question of the appropriation of this sum as an equivalent to the exercise of the right of setoff remains to be determined.

If the mortgage company had built up its deposits after March 13th for the purpose of giving the title company an opportunity to fasten its lien upon such deposits, then an unlawful preference would take place. (*Matters* v. *Manufacturers' Trust Co.*, 54 F. [2d] 1010.) On the other hand, if the deposits continued in the usual and routine manner, a preference cannot be said to have been invoked merely because the bank was a creditor and was able to exercise its right to setoff. (*N. Y. County Nat. Bank* v. *Massey*, 192 U. S. 138.) It would be an anomalous situation to penalize a bank for lending money by obliging it to refrain from accepting further deposits from its debtor until the obligation was paid. In contradiction to those findings, it was also found that from March 13, 1933, to August 2, 1933, the mortgage company continued to maintain deposit accounts of moneys collected in the ordinary course of business and in accordance with the practice which had existed prior to March 13, 1933.

On the 24th day of May, 1933, the mortgage company wrote the Superintendent for permission to make this payment of $250,000 in the light of the rules and regulations promulgated by the latter on March 15, 1933, prohibiting transfer of assets or disbursements without approval. The Superintendent did so approve the payment, but claims that this approval was obtained without knowledge of all the facts and, specifically, of the fact that the collateral had been delivered as a pledge for an antecedent indebtedness.

As I view this transaction, the approval of the Superintendent is immaterial. I shall later consider the changing attitude of the Superintendent as to reliance upon representations and statements made by the mortgage company officials as the basis for the application for rehabilitation from that time to the commencement of this action, after the Superintendent had assumed control as rehabilitator. Here, however, we have the same question presented as that with respect to the $50,000 reduction, namely, whether the payment of $250,000 may be construed as the equivalent of the bank's right to set off that sum out of available moneys. As hereinafter set forth, the Superintendent had no power to approve a payment, preferential in nature and in violation of law, in any

event. Nor had he power to prevent the application of the bank's proper exercise of the right of setoff.

Although the circumstances here show clearly that the $250,000 transaction was in the form of a payment, nevertheless I am of opinion that where a creditor bank has on deposit with it moneys of a debtor available to be used in payment or reduction of indebtedness, the mere fact that in form the moneys were voluntarily turned over, rather than charged against the account, does not serve to defeat the bank of its right to claim that such reduction of a *bona fide* indebtedness was made pursuant to the exercise of its right to setoff. (*Studley* v. *Boylston Nat. Bank, supra.*)

I am, therefore, of opinion that the payment in question should be upheld to the extent of the amount of the free moneys on hand as of March 13, 1933, namely, in the sum of $234,279.53. There is no showing that the amount varied between that time and March 15, 1933. On the latter date, the mortgage company was permitted to reopen pursuant to the rules and regulations of the Superintendent, which, among things, restricted disbursements. The result was thereafter to impound the moneys obtained during the course of business. Such impounding was of moneys not deposited in the ordinary course of business, but were deposits under public authority for the benefit of all creditors rather than a single creditor. The free moneys in question were there at the time of reopening, and subject to the bank's lien. I am unable to agree with the claim that there was even a greater sum. In my opinion, therefore, the payment of $250,000 on June 8, 1933, should be upheld to the extent of $234,279.53. I am of opinion that the respondent's contention that the transactions were neither authorized nor ratified by the mortgage company is contrary to the evidence.

The next contention of the appellant is that the plaintiff, as rehabilitator, has no authority to enforce the rights of creditors or to sue in his own name. The substance of this contention is that article XI of the Insurance Law contemplates actions on behalf of creditors by the Superintendent when he assumes control as liquidator, but makes no similar specific provisions with respect to the Superintendent in the capacity of rehabilitator. But section 401 of the Insurance Law contemplates that the Superintendent, even as rehabilitator, acts as such on behalf of creditors, among others, and section 410 of the Insurance Law provides for injunction against all other persons, inclusive of creditors, from interfering with the Superintendent and from prosecuting any actions against the corporation or against its assets. The Superintendent as rehabilitator is endowed with the powers of a statutory receiver. (*Pink* v. *Title Guarantee & Trust Co.*, 274 N. Y. 167, 171, citing

*Matter of People* [*Title & Mort. Guar. Co.*], 264 N. Y. 69, 80.) As such, he is vested by statute (Pers. Prop. Law, § 19), as well as inherently (*Porter* v. *Williams*, 9 N. Y. 142; *Pittsburg Carbon Co.* v. *McMillin*, 119 id. 46, cited in *Van Schaick* v. *Manhattan Sav. Institution*, 273 id. 37), with the power to prosecute actions on behalf of creditors.

Lastly, the appellant contends that the agreement of August 2, 1933, was effective and binding upon plaintiff. The situation, in brief, was that after arrangements had been made over a period of months between the mortgage company and the Superintendent, with the active co-operation of the appellant, for the Superintendent to take over the mortgage company in rehabilitation, on the eve thereof the appellant announced its intention of setting off the funds on deposit with it as against the note indebtedness. The agreement of August 2, 1933, providing for additional collateral and the waiving of the title company's right to set off its indebtedness as against deposits, was the result of a compromise between the Superintendent and the title company. During the negotiations there were frequent inquiries by the Superintendent with respect to the then financial condition of the mortgage company, and an accountant submitted a report thereof. But no inquiry was made with respect to the condition of the mortgage company as of March 13, 1933. No question had been presented for determination as to the validity of the pledge transaction, in the first instance. Under such circumstances, it is apparent that plaintiff never did ratify the original pledge transaction and was at liberty to set it aside. (*Cumberland Coal & Iron Co.* v. *Sherman*, 30 Barb. 553, 576; *Craighead* v. *Peterson*, 72 N. Y. 279, 285; *King* v. *Mackellar*, 109 id. 215.)

Nor could the Superintendent cure an illegal and preferential transaction by ratification or approval. (*Whitehall W. P. Co., Ltd.*, v. *Atlantic, G. & P. Co.*, 160 App. Div. 208; *People ex rel. United Construction Co.* v. *Voorhies*, 114 id. 351: *Miller* v. *Mayor, etc., of N. Y. City*, 3 Hun, 35.)

The appellant complains that the effect of setting aside this agreement is to deprive it of the right which it had at the time it relinquished it, pursuant to agreement, to offset the indebtedness by the sum of approximately $1,500,000 on deposit. As stated, the appellant is awarded all of the free moneys on deposit with it at the time the mortgage company reopened under the rules and regulations of the Superintendent. The moneys which accumulated thereafter were subject to the rules and regulations enacted by public authority in the public interest, and clearly not moneys deposited in the ordinary routine of business, and, as aforesaid,

in my opinion, were not deposits as to which the right of setoff was available.

The conclusion to which I come on this phase of the case is that the agreement of August second was a nullity, as the pledge transaction of March thirteenth was illegal, and that the appellant, at the time of the making of the agreement, had no right to set off the sum which it attempted to charge upon the mortgage company's accounts, other than the free money already referred to.

The final feature of this case concerns itself with the so-called inconsistent attitude of the Superintendent, as evidenced by the position adopted by him with respect to the petition of one Martha Blumenberg, in attacking the agreement of August second. Despite the original prayer for relief contained in that petition, at the time of argument of the motion the sole relief sought was an order directing an investigation of the circumstances relative to the making of the agreement. That proceeding was instituted in the latter part of 1933. The answer of the Superintendent denied numerous allegations of the petition alleging fraud and preference in the making of the agreement, but by the time the appeal was argued in this court and decided by us in April, 1934 (See *Bond & Mortgage Guarantee Co. [Blumenberg]*, 241 App. Div. 822), the Superintendent, then in all probability more familiar with the facts of the entire transaction, had reversed his earlier position and had commenced the present action. The preferential nature of the original pledge transaction was not even urged by the petitioner in that proceeding.

To summarize: In my opinion, the judgment should be modified by omitting the direction to the appellant to pay the sum of $50,000 by which the indebtedness was reduced on March 13, 1933, and also the direction to the appellant to pay the sum of $250,000, by which the indebtedness was reduced on June 8, 1933, but in lieu of the latter direction a provision should be inserted directing the appellant to pay the sum of $15,720.47, with interest, representing the excess over and above free money. As so modified, the judgment should be affirmed, without costs. Findings and conclusions inconsistent with the foregoing should be reversed and new findings and conclusions will be made, inclusive of the inapplicability of the first sentence of section 15 of the Stock Corporation Law, section 418 of the Insurance Law, and section 276 of the Debtor and Creditor Law.

Present — HAGARTY, CARSWELL, DAVIS and ADEL, JJ.; LAZANSKY, P. J., not voting.

Judgment modified by striking therefrom the direction that the defendant pay forthwith to plaintiff the sums of $50,000 and

$250,000 with interest, and by inserting in lieu thereof a direction that defendant shall forthwith pay to plaintiff the sum of $15,720.47, with interest, and as so modified, the judgment is unanimously affirmed, without costs. Findings and conclusions inconsistent with this determination and the views expressed in the opinion are reversed and new findings of fact and conclusions of law consistent therewith and necessary to sustain the modification of the judgment as aforesaid will be made.

Settle order on notice.