JOSEPH D. GEESLIN, JR., Plaintiff-Appellee and Cross-Appellant, *v.* BLACKHAWK HEATING & PLUMBING CO., INC., Defendant-Appellant and Cross-Appellee.—(ROBERT D. WILCOX, Defendant-Appellee and Cross-Appellant.)

First District (3rd Division)   No. 78-1105

Opinion filed December 31, 1979.

Victor G. Savikas and John F. Newell, both of Karon, Morrison & Savikas, and James V. Creen, of Epton, Mullin, Miller & Druth, both of Chicago (Robert B. Keene, of Duvall, Tabbert and Lalley, of Indianapolis, Indiana, of counsel), for appellants.

Winston & Strawn, of Chicago (Frank O. Wetmore, II, Richard J. Brennan, and Demetri J. Retson, of counsel), for appellee.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:

Joseph Geeslin, liquidator of United Bonding Insurance Company (UBIC), seeks to recover from Blackhawk Heating and Plumbing Company (Blackhawk) assets transferred to Blackhawk pursuant to a settlement of Blackhawk's lawsuit against UBIC, and a declaration that Geeslin, not Blackhawk, is entitled to an escrow fund established by UBIC and Prudence Mutual Casualty Company (also in liquidation). Geeslin alleges that Blackhawk obtained the assets, and its interest in the escrow, as a voidable preference. He also alleges that Blackhawk's interest in the escrow is an unperfected security interest, and so has no priority. The circuit court held that there was no voidable preference, but that Geeslin had superior rights in the escrow. Both sides appeal. We hold for Blackhawk on both issues.

I

■■ The voidable preference issue is governed by Indiana law, for UBIC is an Indiana insurance company in liquidation in the Indiana courts. To have the transfer of assets voided as a preference, the liquidator (Geeslin) must show (i) that UBIC was insolvent, (ii) that UBIC intended to prefer Blackhawk, and (iii) that Blackhawk had reasonable cause to believe a preference would occur. (1935 Ind. Acts, ch. 162, §42, Ind. Code §27—1—4—14(a) (1976).) No Indiana case law interprets these requirements. They were copied from old Federal bankruptcy acts, so the parties have directed us mostly to old Federal cases.

The main legal dispute concerns the second element, UBIC's intent to give a preference. Geeslin argues that under the Federal cases, this requirement had been virtually read out of the act. It is enough, Geeslin says, to show that a preference actually resulted; in other words, that the creditor received more than he would have in liquidation. From this, Geeslin argues, the required intent must be inferred, on the principle that one intends the natural consequences of one's acts.

Whatever earlier Federal cases may have held, we agree with Blackhawk that this approach was rejected in *Wilson v. City Bank* (1873), 84 U.S. (17 Wall.) 473, 21 L. Ed. 723. In that case, the creditor had sued the debtor, who, having no defense, made none; the creditor obtained and executed on a judgment; the debtor was then placed in bankruptcy; and the trustee tried to recover the money as a preference. The Supreme Court denied recovery, declaring that "there must be the positive purpose of doing an act forbidden by [the Bankrupt Act of 1867], and the thing described must be done in the promotion of this unlawful purpose." (*Wilson*, 84 U.S. 473, 484, 21 L. Ed. 723, 727.) Geeslin argues that *Wilson* stands only for the proposition that no presumption arises from inaction,

as opposed to a positive act. The debtor in *Wilson* passively allowed the creditor to levy on his property; here, UBIC voluntarily concluded and paid a settlement.

We believe the court's reasoning leads to a broader conclusion. The debtor, said the court, acted with propriety in not raising false or dilatory defenses to suit. He could not otherwise have prevented the preference except by filing for voluntary bankruptcy. However, he had no obligation to do this; to impose such an obligation would subvert the scheme of the bankruptcy act. In the court's words:

"Such an obligation would take from the right the character of a privilege, and confer on it that of a burdensome and, often, ruinous duty.
* * *

We do not construe the act as intended to cover *all* cases of insolvency, to the exclusion of other judicial proceedings. * * * [I]t still leaves, in a great majority of cases, parties who are really insolvent, to the chances that their energy, care, and prudence in business may enable them finally to recover * * *. All experience shows both the wisdom and justice of this policy.

Many find themselves with ample means, good credit, large business, technically insolvent * * *. But, by forbearance of creditors, *by meeting only such debts as are pressed*, and even by the submission of some of their property to be seized on execution, they are finally able to pay all, and to save their commercial character and much of their property. * * * any creditor can institute proceedings in a bankrupt court. But until this is done, their honest struggle to meet their debts and to avoid the breaking up of all their business, is not, of itself, to be construed into * * * a fraud upon the act." (Emphasis added.) (84 U.S. 473, 485-86, 21 L. Ed. 723, 727-28.)

Since the debtor in *Wilson* could not be expected—legally, morally, or practically—to prevent the preference, no *logical* inference arose from his failure to do so. (*Wilson*, 84 U.S. 473, 484, 21 L. Ed. 723, 727.) The court's concern for logic based on experience, as well as its sensitivity to the morals and realities of business practice, belies the arbitrary and rigid interpretation of the case that Geeslin suggests.

■ The principle to be derived from *Wilson*, we believe, is more modest and sensible. Intentions are hard to prove by direct evidence. The law therefore allows an evidentiary presumption that a debtor does not give a preference unless he intends to do so. Normally businesses do not just give away money for no reason. But the presumption may be overcome. Where there is evidence establishing an alternative motive for the debtor's

acts, the inference is less weighty. The court should not be blinded to facts.

This interpretation may lead to delay, or even allow some unlawful preferences to escape detection. There is much to be said for a rule that does not look to actual intent. Many modern statutes (starting with the bankruptcy act of 1898) are more mechanical. But Indiana has adopted and maintained an intent test in its legislation long after the problems became apparent and other jurisdictions responded with reform acts; and we must apply the Indiana statute.

Since the evidence in this case is complex, we shall merely summarize the highlights and our conclusions. The witnesses were heard by a Federal judge, who turned out to have no jurisdiction. When the case recommenced in the Cook County circuit court, the parties stipulated that the witnesses, if called, would testify as they did in the Federal court. Consequently, the circuit court judge heard no live testimony. Although we are not bound to defer to the findings of the previous judges (*Barraia v. Donoghue* (1977), 49 Ill. App. 3d 280, 364 N.E.2d 952), we concur with their conclusions on this issue.

The record reveals that UBIC's president was an optimist. He had been promised additional capital as soon as Blackhawk's claim against UBIC was settled satisfactorily. He believed, or at least hoped, that the settlement he negotiated with Blackhawk would enable his company to survive. In his view, UBIC's problems were mostly with cash flow; his thinking was that if he could hold things together awhile, everything would work out.

Time, however, was running out. A jury had been empaneled to try Blackhawk's suit against UBIC and opening statements had been concluded. Blackhawk was asking a million dollars. UBIC was largely covered by reinsurance—admittedly, temporarily hard to collect—on count I, for $390,000. It was completely exposed on count II, for the other $600,000. A substantial verdict on count II would break the company. All previous attempts to settle had failed. At this stage of the litigation, the presidents of the two companies met personally, and they succeeded in arriving at a settlement. The settlement was worth $360,000, all attributed to count I. Much of it was to be paid by the reinsurers; very little cash was involved, and some of that was to be paid in installments, stretching several months ahead.

We do not believe that UBIC was trying or planning to give a preference to Blackhawk over its other creditors. It was taking its best chance, perhaps its only chance, to live to pay all its debts in full.

■■ ■ Geeslin cites *Van Schaick v. Title Guarantee & Trust Co.* (1937), 252 App. Div. 188, 297 N.Y.S. 827, as holding that the debtor's hope or

desire makes no difference. The case is not in point. It involved a huge payment between affiliated companies. The court held that the mere hope of paying all creditors cannot excuse the fixed intent to prefer one creditor. An intent to ensure that one is paid, whether or not insolvency results and the payment becomes a preference, is an intent to prefer. But that is not the same as a tactical decision to pay a creditor in order to obtain an advantage. Here, some control over the judgment, and an infusion of capital, which enhanced the prospects for survival, were part of such a tactical decision. UBIC's simple knowledge that things might after all go differently than hoped, and its payment might then become a preference, was not an affirmative intent to prefer. (Paying the creditor who threatens immediate bankruptcy proceedings is an intermediate case, which we do not decide.)

Blackhawk, on its part, did not realize it was getting a preference. The settlement was presented to it as one that would let UBIC carry on. UBIC and its president represented that UBIC's balance sheet, which showed that it was solvent, was properly completed. We now know, although it was not evident to Blackhawk at the time settlement was reached, that UBIC's accounting was questionable. We do not believe that Blackhawk would have agreed to installment payments if it had thought that UBIC was insolvent. Blackhawk's suspicions, indeed, were the other way: it was worried that UBIC could pay more but was "poormouthing" to get a better deal.

Geeslin says that Blackhawk, even if it did not know definitely that it was being preferred, knew enough about UBIC's precarious finances to impose upon it a duty of inquiry. But, mere suspicion or worry should not be fatal. Many creditors grow fearful when their debtor grows stubborn or slow. We believe that Blackhawk was as circumspect as could reasonably be expected under the circumstances.

● 5 The statute requires reasonable cause to *believe*. Even where the creditor is aware of the debtor's insolvency, if he still honestly and reasonably believes that the debtor will remain in business and pay all his debts, there is no voidable preference. As Judge Learned Hand expressed it:

> "That creditor only the statute proscribes who dips his hand in a pot which he knows will not go round. Hence it follows that, while there is an honest chance of continued life, he need not quench it at his own peril. The only test is the honesty of his purpose."
> (*Kennard v. Behrer* (S.D.N.Y. 1920), 270 Fed. 661, 664.)

Thus, Geeslin has failed the third as well as the second test for setting aside a transfer as a voidable preference.

Had UBIC and Blackhawk not settled when they did, their lawsuit would have sped to judgment and execution. Blackhawk might have

obtained more than the settlement gave it; but whatever it obtained would not have been a preference. (*Wilson.*) Or, alternatively, the companies might have settled only on a sum of money to be paid (possibly more than the actual settlement), have had a consent judgment entered, and left Blackhawk to collect the judgment by process of law. Geeslin does not object to the compromise amount, only to the voluntary payment. He wants Blackhawk to wait in line with the other creditors for the agreed sum. In either case, the sheriff's seizure of the office furniture would quickly have put UBIC out of business. Instead, the companies negotiated a comparatively easy payment plan. This benefited UBIC and therefore its creditors. The only objection we can see to the settlement that was reached is that it kept UBIC afloat long enough to lose more money; but that is neither Blackhawk's fault nor Blackhawk's problem. Neither Blackhawk nor UBIC itself had any obligation to throw UBIC into liquidation; every other creditor had an equal right to do so.

The rule Geeslin seeks to impose would make it perilous for creditors to be accommodating, and impossible for insolvent debtors to function. From insolvency, says Geeslin, there is no return; liquidation is the only remedy. True, the debtor need not personally march to the courthouse and file the papers; but neither can he avoid that fate. Geeslin's view was expressly condemned in *Wilson*, and we decline to follow that view.

❡ 6 The settlement, including the arrangements for payment, was, in the judgment of those lawfully in control of UBIC at the time, in the corporation's best interest. It is not for liquidators, or courts, to override that business judgment just because it was incorrect. The settlement, in which Blackhawk gave up its prospect of a large jury verdict, was a bargain that we should not lightly set aside, especially because public policy favors the amicable settlement of disputes. That policy would be thwarted if only involuntary payments were safe from the liquidator.

█ We hold that Geeslin may not recover the assets transferred to Blackhawk in settlement of its lawsuit.

## II

The parties also quarrel over an escrow fund set up to secure payment of Prudence Mutual's obligations to UBIC. Pursuant to the settlement, UBIC assigned to Blackhawk all its claims against Prudence, and all its rights in the escrow, until Blackhawk should have recovered therefrom $130,000 plus a proportionate share of any increased value of the fund from the time of the assignment. Blackhawk promptly notified the escrowee of the assignment, but never filed a financing statement covering the transaction.

There is no doubt that UBIC's interest in the escrow was a security

interest. Geeslin contends that the assignment of this security interest was a secured transaction within article 9 of the Uniform Commercial Code (Ill. Rev. Stat. 1969, ch. 26, par. 9—101 *et seq.*), that as against creditors of UBIC (represented by Geeslin) Blackhawk had only an unperfected security interest, and that Blackhawk's rights in the escrow are therefore subordinate to Geeslin's under section 9—301 of the Uniform Commercial Code—Secured Transactions (Ill. Rev. Stat. 1969, ch. 26, par. 9—301).

Blackhawk's position is that the assignment was not a secured transaction, but an outright conveyance of all UBIC's rights, that there was therefore nothing to perfect, and that Geeslin's rights in the escrow are nonexistent except as reserved to UBIC by the assignment agreement. Blackhawk also argues that even if its interest was a security interest, it was perfected by notice to the escrowee in possession. The first point is dispositive of the security interest issue, so we need not consider the second point.

Geeslin has never contended, and Blackhawk has denied, that the transaction here was a sale of accounts, contract rights, or chattel paper; any such theory is accordingly waived. The assignment, therefore, is within article 9 only if it was intended to create a security interest. (Ill. Rev. Stat. 1969, ch. 26, par. 9—102(1).) A security interest is an interest that secures payment or performance of an obligation. Ill. Rev. Stat. 1969, ch. 26, par. 1—201(39).

■■ We agree with Blackhawk that the assignment was made to *pay* a debt, not to secure one. Blackhawk's money was to come from Prudence and the escrow, not UBIC, whose debt the assignment discharged. The assignment was not a way to ensure that someone else would pay Blackhawk if UBIC didn't, but rather an agreement that Blackhawk would accept a secured claim against Prudence in full satisfaction of its claim against UBIC. The transaction was not intended to create a security interest in UBIC's security interest in the escrow.

The assignment could not have caused UBIC's creditors to believe that UBIC was financially sounder than it was. UBIC's books, after the assignment, should no longer have shown the transferred part of the escrow as an asset, since UBIC had no interest in it; UBIC could not properly treat it as an asset balanced by a liability to Blackhawk, for UBIC had no such liability. Moreover, any creditor who had once heard of the escrow fund or saw it listed as an asset on UBIC's books and was concerned about the item's accuracy, need only have asked the escrowee, who would have informed him that UBIC's interest in the escrow now belonged to Blackhawk. This was not an assignment of a large volume of small, routine accounts, maintained separately from the record of the assignment. The transfer was as unique, prominent, and readily accessible to curious creditors as was the escrow itself. It involved no secret lien.

There was no need for a financing statement to protect anyone against it; and the law should not strain to require one.

This was not a commercial financing transaction. It was not in the usual course of either company's business. Instead, it was an isolated assignment. It should not be invalidated *ex post facto*. *Cf*. Ill. Ann. Stat., ch. 26, par. 9—302, Uniform Commercial Code Comment, at 159 (Smith-Hurd 1974) (sales of accounts).

■■ One can, of course, create a security interest in a security interest. But that kind of transaction must be distinguished from what is presented to us in this case—the outright sale or assignment of a pre-existing security interest, a transfer of all the transferor's rights to someone else, who steps into his shoes, leaving the transferor with nothing. Such a transfer does not create a security interest. Unless the transferred security interest is the special sort called chattel paper, such a sale is no more within article 9 than the sale of any other personal property.

■■ Blackhawk received a security interest which it did not formerly have; but that was to secure the debt of Prudence, not UBIC. Section 9—302(2) of the Uniform Commercial Code provides that no filing is necessary to continue the perfected status of a security interest after the secured party assigns it. Geeslin argues that this section obliged Blackhawk to file in order to achieve priority over UBIC's creditors, as opposed to the Prudence creditors. His interpretation of section 9—302(2) is incorrect. The section has no effect on the priorities between Blackhawk and UBIC's creditors. If the assignment had been intended for security (or was a sale of accounts, contract rights, or chattel paper), Blackhawk would have had to take the usual steps to be protected against UBIC's creditors; but section 9—302(2) does not impose any duty where none would otherwise exist. Ill. Ann. Stat., ch. 26, par. 9—302, Uniform Commercial Code Comment, at 159-60 (Smith-Hurd 1974).

Blackhawk's appeal is allowed; Geeslin's cross-appeal is denied. Blackhawk is entitled to judgment on both counts of Geeslin's complaint.

Affirmed in part and reversed in part.

McNAMARA and RIZZI, JJ., concur.