PINE TOP INSURANCE
COMPANY, Plaintiff,

v.

CENTURY INDEMNITY COMPANY and
Bank of America National Trust and
Savings Association, Defendants.

88 C 4330.

United States District Court,
N.D. Illinois, E.D.

Nov. 27, 1990.

James R. Stinson, Holly A. Harrison, Susan A. Stone and Todd C. Jacobs, Chicago, Ill., for plaintiff.

Phil C. Neal, Ralph T. Russell, Jr. and Lawrence M. Benjamin, Chicago, Ill., for Bank of America Nat. Trust & Sav. Ass'n.

David M. Spector, Thomas S. Kiriakos and Nancy Linnerooth, Chicago, Ill., for Century Indem. Co.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Pine Top Insurance Company ("Pine Top"), an Illinois insurance company currently in liquidation under Illinois Insurance Code Art. XIII (Ill. Rev. Stat. ch. 73, ¶¶ 799–833.13 [1] ), has sued Century Indemnity Company ("Century") and Bank of America ("Bank") under Insurance § 816(2) to recover two allegedly voidable preferential transfers. Bank and Century now move separately under Fed.R.Civ.P. ("Rule") 56 [2] for summary judgment (Century's motion being limited to First Amended Complaint Count I). For the reasons stated in this memorandum opinion and order, Bank's motion for summary judgment is granted and Century's motion is denied.[3]

---

**1.** Further references to the Insurance Code will take the form "Insurance § —," referring to the numbering in the Smith–Hurd statutory compilation rather than to the internal numbering of the Insurance Code (for example, Insurance § 816(2) in the statutory compilation would correspond to "Insurance § 204(2)" if the internal numbering had been used). Despite such use of the compilation's numbering scheme, this opinion nonetheless employs "§" rather than "¶" to conform to the General Assembly's continued usage of the former symbol, even though Smith–Hurd shifted to the "¶" symbol some years ago.

**2.** Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548,

2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovants—in this case (1) Pine Top and Century as to Bank's motion and (2) Pine Top and Bank as to Century's motion (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)).

**3.** After this opinion was dictated and on the word processor but was awaiting editing into final form, counsel for Bank sent this Court a copy of the November 16, 1990 slip opinion by this Court's colleague Honorable Harry Leinenweber in *Pine Top Insurance Co. v. Republic Western Ins. Co.,* 123 B.R. 277 (N.D.Ill.1990). There Judge Leinenweber dealt with legal issues

## Facts [4]

Pine Top provided reinsurance coverage for Century in accordance with reinsurance treaties between them. Those treaties required Pine Top to reimburse Century for certain losses covered by the reinsured policies that Century had initially issued. From time to time Century would require Pine Top to establish standby letters of credit ("LOCs") to secure its obligations under the treaties. By February 1986 [5] Pine Top had a debt of approximately $2,875,961 owing to Century under the reinsurance treaties, and that is the amount in dispute in this case.

To enable Pine Top to give security for its reinsurance treaties, its parent company Greyhound Corporation ("Greyhound") [6] asked Bank to grant Pine Top a line of credit of $10 million on which LOCs could be drawn. Greyhound told Bank that Pine Top required some of the LOCs to replace other LOCs that had expired on December 31, 1985 and that it urgently needed to have the $10 million line of credit in place to facilitate their replacement. Bank had no previous dealings with Pine Top, but it was willing to extend a line of credit to Pine Top only because of Bank's relationship with its long-time customer Greyhound. In fact, all the negotiations surrounding the establishment of the line of credit were between Greyhound and Bank.

Bank's officer-in-charge of the Greyhound account was Robert Troutman ("Troutman"), who had no experience in issuing LOCs for insurance companies. When Greyhound approached Troutman seeking the line of credit, it asked that the credit be provided on an unsecured basis. Troutman refused to do so and insisted that the credit be fully collateralized from its inception.[7] At the time of Bank's commitment and at all times thereafter it was understood by Bank, Greyhound and Pine Top that the line of credit was to be fully secured. Bank's February 10 commitment letter to Pine Top set forth the terms under which Bank would provide Pine Top with a $10 million line of credit conditioned upon the provision of specified collateral. That collateral was to comprise (1) Pine Top's current and future reinsurance recoverable receivables, (2) $6.8 million in its short-term notes and (3) a $3.2 million standby LOC to be issued by Bank to Pine Top on the account of Greyhound Corporation.[8]

On about February 20 Greyhound transmitted to Bank ten applications for letters of credit on Pine Top's behalf, to be issued against the $10 million line of credit. One of those called for an LOC to be issued to Century in the amount of $2,875,961. On February 26 Bank issued and transmitted that LOC to Century, which received it by March 4.

Before the issuance of the LOC, the collateral that was contemplated in the original agreement was identified by the agreement itself and by other correspondence between Pine Top and the Illinois Depart-

---

identical to those presented here—and with a factual situation that as to most of the issues was legally equivalent if not entirely parallel to the scenario described here (that case too involved a letter of credit issued by Bank under the identical circumstances about to be described in the "Facts" section of this opinion). In every respect the ultimate results reached in the two cases coincide, though some aspects of the analyses in the two opinions differ. There has been no need to edit this opinion by reason of Judge Leinenweber's opinion, except to add this purely informational footnote and the parenthetical comment in n. 41.

4. Century has once before asked—unsuccessfully then as now—for a summary judgment, on that prior occasion as now limited to Count I of Pine Top's First Amended Complaint. This statement of facts draws to some extent upon this Court's earlier opinion, 716 F.Supp. 311,

312 (N.D.Ill.1989) (the "Opinion"). Later citations to the Opinion will take the form "Opinion at —," reflecting the page number but not repeating the volume number in F.Supp.

5. All further dates also refer to 1986 unless otherwise noted.

6. Pine Top was at the time a wholly-owned subsidiary of Greyhound.

7. Greyhound's policy was that it would not guarantee LOCs for its subsidiaries (Troutman Dep. I 31).

8. At that time there was already in existence a standby LOC in that same amount issued by another bank. What was anticipated by the parties was that Bank's issuance of its LOC would replace the existing one.

ment of Insurance ("DOI"). Pine Top informed DOI as early as February 19 of the loan agreement with Bank and of the fact that Pine Top was pledging approximately $10 million of its assets to Bank to secure the issuance of LOCs to companies reinsured by Pine Top.

Bank and Pine Top had intended the $10 million line of credit to be 100% collateralized up front. Nonetheless, although the nature of the collateralization was set forth in the February 10 commitment letter and although Greyhound assured Bank that the collateral would be transferred as soon as possible, the collateral itself was not turned over immediately. About two weeks after the acceptance of the LOC by Century, Greyhound caused Pine Top to execute the Security and Investment Agreements and the security agreements giving Bank its security interest in Pine Top's reinsurance recoverables (those documents bear an execution date of March 18 but were not actually delivered to Bank until about April 18).[9] On approximately the same March 18 date Pine Top executed an assignment of the to-be-issued Greyhound LOC of $3.2 million, which Bank then issued and took possession of on April 17. Then on April 22 Greyhound transferred cash in the amount of approximately $6.8 million from its accounts at the Continental Bank in Chicago to Bank. Bank invested those funds in short-term securities, which were thereafter held by Bank as collateral pursuant to its agreement with Pine Top.

Pine Top had in fact been insolvent since at least February 26 (the date of the Century LOC). In the later substantive discussion this opinion will address the question whether Bank did or did not have any reason to believe that Pine Top was in danger of insolvency at that time or at any time before the transfer of the collateral. What the record reflects is that Bank had then received Pine Top's 1984 and 1985 Annual Statements and its Quarterly Statement for the Third Quarter of 1985. On about May 21, only *after* Bank had already received the security transferred to it by Pine Top, it received the Quarterly Statement for the First Quarter of 1986, which showed that Pine Top's surplus had shrunk substantially and was extremely slender. Importantly, all of the financial information known by Bank throughout the relevant period *before* it received its collateral security indicated that Pine Top's assets exceeded its liabilities. In any event, Bank did not conduct any further analysis of Pine Top's financial condition before Bank's extension of credit or its receipt of security, looking instead to the fact that it would be fully secured. Additionally, Bank believed that Greyhound would stand behind Pine Top.[10]

As for Century, there is substantial evidence that Century had reasonable cause to believe that Pine Top was insolvent—and there is none to the contrary.[11] At the time of the LOC Pine Top was already in arrears to Century in payments totalling approximately $732,000 on a total indebted-

---

**9.** Century argues that the March 18 execution date is not relevant because the delayed delivery date was necessitated by the lack of authority in Pine Top's officers who had affixed their signatures to the documents. That is not the case. In fact the record reflects that the signing officers *had* the required authority when they signed—authority actually dating back some years. What occasioned the delayed delivery instead was the assemblage of a document package that included attestations of the prior Board of Directors meetings granting the authority. To the extent, then, that *execution* rather than *delivery* of any document granting a security interest is the relevant fact, March 18 rather than April 18 is the controlling date. That turns out to have significance here as to the reinsurance recoverables—and as the later discussion reflects, that is enough to control the result.

**10.** Pine Top argues that Greyhound's refusal to give a guaranty shows that Bank knew that Greyhound would not stand behind Pine Top. But as n. 7 reflects, Troutman's Dep. I 31 explains that it was simply Greyhound's policy not to issue guaranties.

**11.** Century inexplicably seems to believe it can move for summary judgment—thus making a legal statement that the case need not be tried in evidentiary terms because there are no material factual issues in dispute—and at the same time may hold back on addressing the factual question whether it had reasonable cause to believe Pine Top insolvent, expecting to confront that issue at the trial that it says is unnecessary. This subject is dealt with at greater length later in this opinion.

ness of approximately $2,875,961. Century knew that Pine Top was unable to pay its debts. It also knew that Pine Top was "potentially insolvent" (Group Ex. K). Additionally, on June 23 the Illinois Director of Insurance filed a verified petition for the rehabilitation of Pine Top, which then entered into voluntary rehabilitation pursuant to the Illinois Insurance Code. With knowledge of those facts and just three weeks short of Pine Top's entry into liquidation, on December 29 Century reimbursed itself from the LOC for 100% of Pine Top's indebtedness to Century— $2,875,961. Pursuant to its obligation under the LOC, Bank honored the draft and then reimbursed itself by liquidating collateral held under the security agreements with Pine Top. On January 16, 1987 Pine Top was determined by the Director of Insurance to be insolvent and was ordered into liquidation.

On May 17, 1988 DOI filed this action against Century to recover the alleged preference in the amount of $2,875,961 received by Century as a result of the LOC issued by Bank. DOI amended its complaint on October 5, 1988 by adding Bank as a defendant, seeking to recover the alleged preference of the security transferred to Bank. As already stated in n. 4, Century has earlier filed a motion for summary judgment, which this Court denied on June 8, 1989 in the Opinion.

*Bank's Summary Judgment Motion*

Insurance § 816(2) provides:

Any transfer of, or lien upon, any property of any company made or created within four months prior to the filing of a complaint under this article, which gives to any creditor or policyholder or enables him to obtain a greater percentage of his debt than any other creditor or policyholder in the same class; which is accept-

ed by a creditor or policyholder having reasonable cause to believe that such a preference will occur, shall be voidable.

In purely surface terms it might appear that Bank received a preference under Insurance § 816(2). It took actual possession of the security about two months after it issued the LOC to Century (and thus within the four-month statutory period preceding the complaint by the Director of Insurance seeking Pine Top's rehabilitation). Hence it is entirely proper for Pine Top, through the liquidator, to attempt recovery from Bank of an alleged preference of nearly $2.9 million. In the absence of any other facts, there would therefore be a clear preference *if* (and only if) Bank had "reasonable cause to believe" that a preference would occur.

But there are three potential exceptions to liability under Insurance § 816(2) that Bank says are called into play here:

 1. that the transfer of collateral was "substantially contemporaneous" with the issuance of the debt through the LOC;

 2. that Bank had an equitable lien on the assets, so that the transfer of those assets relates back to the time of the creation of the debt; and

 3. that even if the transfer would otherwise have been a preference, Bank had no "reasonable cause to believe" that its action would constitute a preference.

As the ensuing analysis reflects, each of Bank's arguments would be an independent source of insulation from Insurance § 816(2) exposure. They will be dealt with in turn.

1. *Substantially Contemporaneous Exchange*

 In bankruptcy law [12] a "substantially contemporaneous" exchange is not a voidable preference. That doctrine was

---

**12.** All parties agree that the relevant law for the interpretation of the Illinois Insurance Code's insolvency provisions is pre–1938 bankruptcy law (that in effect when the Insurance Code was enacted), supplemented by any later bankruptcy law that does not conflict with the Insurance Code (*see People ex rel. Gerber v. Central Casualty Co.,* 37 Ill.2d 392, 397, 226 N.E.2d 862, 866

(1967)). *Stamp v. Insurance Co. of North America,* 908 F.2d 1375, 1382 (7th Cir.1990) states in construing Insurance § 816:

 We assume that Illinois would look to cases under the 1898 [Bankruptcy] Act, rather than the 1978 Code, when searching for guidance.

And *Stamp* repeats that proposition in the * footnote to that statement.

first articulated in *Dean v. Davis*, 242 U.S. 438, 443, 37 S.Ct. 130, 131, 61 L.Ed. 419 (1917), which held that a debtor's transfer of property one week after the making of the loan secured by that transfer was *not* a preference because (1) the parties had intended from the beginning that the loan be secured and (2) the two transactions were "substantially contemporary."[13] Development of the substantially-contemporaneous-exchange doctrine in the bankruptcy context has since been colored by enactment of the Bankruptcy Code, 11 U.S.C. § 547(e)(2)(A),[14] which relates back a security interest that is perfected within ten days after the original transfer. But even though that recent addition to bankruptcy law may fairly be viewed as an outgrowth of *Dean*, it cannot of course control the application of the *Dean*-announced rule to cases, such as this one, that are to be decided under a 1937 state statutory enactment and its corollary in pre–1938 bankruptcy law. Furthermore, it does not appear even under the new bankruptcy statute that the *Dean* rule is necessarily always limited by any arbitrary time limit. As this Court explained in Opinion at 314:

> There is a separate line of cases (typified by *In re Arnett*, 13 B.R. 267 (Bankr.E.D. Tenn.1981), *aff'd*, 17 B.R. 912 (E.D.Tenn. 1982)[15]) that rejects Bankruptcy § 547(e) as defining the exclusive limitation on Bankruptcy § 547(c). Those cases look at the initial intent of the parties even if the security transfer

takes place more that ten days later. And because the Illinois Insurance Code has no provision corresponding to Bankruptcy § 547(e), there would seem to be even less reason to be bound exclusively by a ten-day cutoff here.

In any case, *Dean*'s "substantially contemporaneous" rule as applied to Bank's taking of security has no per se time limit.[16] Of course, there are equitable limits on a creditor's right to assert a substantially contemporaneous transfer. But in this case the mere 14–day period that elapsed between the receipt of the LOC by Century (March 4) and the date of Pine Top's execution of the document assigning the reinsurance recoverables to Bank (March 18), because that assignment implemented the always-intended nature of the transaction as fully secured, falls clearly within the scope of the *Dean* Rule.[17]

Although *Dean* stated (1) intent to secure the creditor and (2) substantial contemporaneity as a dual requirement, its focal point is not a particular time frame but rather the parties' intent. That dominant theme is readily understandable if the analyst takes the proverbial step backwards from the purely mechanistic application of some calendar requirement to remember instead what "preferences" are all about. After all, what is sought to be avoided by the preference doctrine is the depletion of the debtor's estate by one creditor to the prejudice of other creditors who are then forced to share in a lesser pot.

13. *Dean, id.* at 443–44, 37 S.Ct. at 131–32 (citations omitted) explains that in cases in which there is a "substantially contemporary advance" the secured lender could be liable if it intended to "enable the debtor to make a preferential payment with bankruptcy in contemplation." Any such liability, however, would not be for taking a preference, but rather for causing a fraudulent transfer. Here there is no evidence whatever of collusion such as to make out a charge of fraud against Bank.

14. Further references to the Bankruptcy Code will take the form "Bankruptcy § —."

15. [Footnote by this Court] *Arnett* was reversed by the Sixth Circuit (731 F.2d 358, 363 (6th Cir.1984)) because it held the decision was controlled by Bankruptcy § 547(e)(2)'s ten-day rule—a rule that simply does not exist in pre-

code bankruptcy law or in the Insurance Code. Incidentally, the Opinion followed West Publishing Company's lead in referring to its own Bankruptcy Reporter as "B.R." This opinion will follow the Blue Book notation instead: "Bankr."

16. For example, *In re Martella*, 22 B.R. 649 (Bankr.D.Colo.1982) held that a transfer of a security interest in an automobile 45 days after the debt was incurred was substantially contemporaneous.

17. Pine Top's debt to Bank could not be said to arise, even in the earliest and wholly metaphysical sense, until it issued the LOC to Century on February 26. But that date is really too early—in fact, the LOC was not established until it was *received* by Century about March 4 (UCC § 5–106(1)(b) expressly so provides).

And where the facts rather reflect the introduction of a *new* creditor who commits to provide *fresh* money on condition that the new advances must be secured, the fact that the security is not actually transmitted by the debtor until some time after it has received the infusion of fresh money has in no way defeated the legitimate expectations of the other creditors—for their net available pot of assets is no more and no less than before the new creditor came into the picture. Indeed, what Pine Top seeks (or more accurately its other creditors seek) as against Bank is not at all to prevent the latter from stealing a march against the other creditors, but rather to sweeten the pot for those other creditors at Bank's expense.[18]

Little wonder, then, that the application of the *Dean* concept of "substantially contemporaneous" looks to matters other than the mechanistic ticking of the clock.[19] And so it is that *In re Arnett*, 13 B.R. 267, 269 (Bankr.E.D.Tenn.1981) states:

> The "substantially contemporaneous" exception clearly contemplates factors other than time. Whether a transfer is "substantially contemporaneous" requires a consideration of the surrounding facts.[20]

Nor did *Dean* invent the notion that courts should consider surrounding facts indicative of intent when deciding whether there has been a preference. For example, *Sexton v. Kessler & Co.*, 225 U.S. 90, 96–97, 32 S.Ct. 657, 658–59, 56 L.Ed. 995 (1912) considered facts quite similar to those in this case and found:

> [The parties'] conduct should be construed as adopting whatever method consistent with the facts and with the rights reserved is most fitted to accomplish the result.... So the question is whether anything in the situation of fact or the rights reserved prevents the intended creation of a right *in rem,* or at least one that is to be preferred to the claim of the trustee.

Likewise, *National City Bank of New York v. Hotchkiss*, 231 U.S. 50, 56, 34 S.Ct. 20, 21, 58 L.Ed. 115 (1913) (citing *Sexton*)[21] reasoned:

> In dealing with transactions of this kind we may go far in giving them any form that will carry out the mutually understood intent.

In short, *Dean* requires that this Court determine the intent of the parties, and in

---

**18.** This analysis, framed in terms of the policy that informs the law of preferences, also explains why *Dean* and its progeny include any time-oriented requirement at all. After all, the creditors' pool is seldom static—both the identity of the creditors and the amounts of indebtedness due to them fluctuate over time. If *too* much time were to elapse between the provision of fresh money to the debtor and its return of security to the provider of those funds (even though the security was always intended), other parties who had extended credit in the meantime on the strength of a seemingly more solid financial base in the hands of the debtor would be more likely to be misled to their own disadvantage. Hence the call for a "substantially contemporaneous" set of events.

**19.** This is not to be mistaken for an unwillingness to follow the Bankruptcy § 547(e)(2) ten-day rule where it applies (as it does not here). And of course, in addition to the factor discussed in n. 18 there are always good policy reasons—the principal one being certainty—for statutory adoption of any bright-line rule. But it must again be underscored that the later-enacted bright-line rule cannot illuminate the analysis or result here.

**20.** [Footnote by this Court] *Arnett,* 13 B.R. at 269 says as to facts that are entirely comparable to those at issue here:

> Under the facts of this case there was no "race" [to the courthouse to seize debtor's assets prior to bankruptcy—"to dismember the debtor during his slide into bankruptcy" (quoting from the legislative history of the Bankruptcy Code) ]. It was a normal business transaction. No creditor attempted to obtain priority over another. No general unsecured creditor ever had cause to look to this vehicle as a source of repayment. There was no risk of fraud or misrepresentation by any delay in perfecting the security interest.

**21.** Pine Top seeks to use the outcome in *Hotchkiss,* which found that a preference was taken, to support its claim against Bank. But wholly unlike the transaction in issue here, in *Hotchkiss* there was no prior agreement for security. Only after the bank noticed a drop in the firm's stock and after the firm then informed the bank that bankruptcy was about to be filed that afternoon did the parties agree to the transfer of securities (*id.* at 56, 34 S.Ct. at 21). Indeed, that very difference underscores the point made in the preceding paragraph of the text here.

this case it is crystal-clear. Bank issued to Century, on behalf of Pine Top, an LOC that was not only intended to be fully secured but that never would have been issued but for that intent and but for the expectation that it would be implemented. Under the factual scenario that ensued here, it must be concluded that the issuance of the LOC and the later transfer of the collateral were substantially contemporaneous in the legal sense.[22]

There is no question that by March 18 Bank had a secured interest in Pine Top's reinsurance recoverables, which were valued at approximately $16 million. At that time Pine Top executed a security agreement (Bank Ex. 8) that "assigns and transfers" to Bank:

> Those receivables payable by certain companies presently identified as "Reinsurance recoverable on loss payments" on Debtor's financial statements constituting Debtor's assumed reinsurance claims as they may change from time to time.

> [T]ogether with all proceeds thereof, as security for the payment of all debts, obligations, and liabilities now or hereafter existing, absolute or contingent, of Debtor, pursuant to that certain Commitment Letter dated as of February 10, 1986. . . .

That document, executed in direct fulfillment of the demand for such specific security in the February 10 commitment letter, clearly "transfers" security to Bank in an amount that exceeds the indebtedness that the Century LOC created.[23] It is wholly irrelevant whether Bank eventually reimbursed itself from that particular collateral or from other later-provided collateral (thus freeing up the first-assigned security), so long as the net result of the transfer did not diminish the value of the estate and thus did not adversely affect the other (and unsecured) creditors. Indeed, even if Bank's later reimbursement were to be characterized as a payment from funds in which Bank had no security, the fact that Bank was already fully secured means that it took no preference. As *In re Pitman*, 843 F.2d 235, 241 (6th Cir.1988) (citations omitted) stated:

> The concept here is the same as the idea developed in old Supreme Court opinions under old bankruptcy acts—that a voidable preference must "impair" or "diminish" the estate. It is also the same as the idea developed in more recent circuit court opinions holding that payments made to a fully secured creditor were not voidable transfers because the payments reduced the amount of debt with a corresponding increase in the value of the debtor's equity in the collateral.

**22.** Century cites a number of cases for the proposition that the time period between the agreement and transfer of the security to Bank was too long to be substantially contemporaneous. *In re Christian*, 8 B.R. 816, 819 (Bankr.M.D.Fla. 1981) is inapposite—there the issue involved an enabling loan and there was an express statutory method (which the bank did not follow) for the bank to perfect its lien. Century's other support is also unhelpful. In both *In re Arctic Air Conditioning, Inc.*, 35 B.R. 107, 109 (Bankr. E.D.Tenn.1983) and *In re Hudson Valley Quality Meats, Inc.*, 29 B.R. 67, 77–78 (Bankr.N.D.N. Y.1982) the parties failed to enter into any agreement giving rise to a security interest. *In re General Office Furniture Wholesalers*, 37 B.R. 180 (Bankr.E.D.Va.1984) involved neither any actual security nor any agreement for security; rather, what was at issue was a payment on a debt. Finally, Pine Top cites *In re Diamond Mortgage Corp. of Illinois*, 78 B.R. 196 (Bankr.N. D.Ill.1987) for the proposition that a six week interval did not qualify as "substantially contemporaneous." However, the court there ana-

lyzed the case as a sale of promissory notes secured by real property mortgages, *not* as a secured transaction (*id.* at 198 n. 8). Indeed, the court pointed out that even if it had treated the exchange as secured, the purchasers "never took actual possession of the three notes" so as to obtain a perfected security interest.

**23.** There is some dispute as to when the other two forms of security, the $3.2 million Greyhound LOC and the $6.8 million "cash" collateral, were actually transferred for the purposes of creating Bank's security interest. All parties agree that the latest dates for the transfers were April 17 for the LOC and April 22 for the other collateral. Leaving aside the plainly established security interest in the reinsurance recoverables, it is arguable that the elapsed time between March 4 (the creation of the debt) and the transfer of the other collateral would still satisfy the concept of "substantially contemporaneous" under the *Dean* analysis, but this Court does not need to reach that issue here.

This discussion has been prolonged not so much by any degree of difficulty that the issue poses in this instance as by the obviously broad applicability of the concept to commercial transactions arising every day in the course of business financing.[24] In this instance it is clear that, true to the original intent of the parties as expressed in the commitment letter pursuant to which the Century LOC was later issued, Pine Top's transfer of the security interest in the reinsurance recoverables was "substantially contemporaneous" with the delivery of the Century LOC two weeks earlier.

## 2. *Equitable Lien*

■ Bank urges that its motion for summary judgment is supported not only by the substantially-contemporaneous-transfer doctrine but also by the doctrine of equitable liens. Note, *Bankruptcy—Preferences—Completion of Equitable Liens Within Four Months Period Prior to Petition*, 12 Minn.L.Rev. 378, 381 (1927-28) (citations omitted) explains the doctrine of equitable liens as it applied under pre-Code bankruptcy law:

> Perhaps the simplest form in which an equitable lien enters the bankruptcy courts is that of an agreement to pledge specific property, as security for a loan, without actual delivery of possession.... [I]f, under the local law, the agreement fixed an immediate right as to specific property, for which equity would afford relief, the lien may be perfected by a transfer of possession, even within the four months period.[25]

It should be obvious that the underlying reasons for the use of the equitable-lien doctrine parallel those of the holding in *Dean*, as well as conforming to this Court's analysis of the whole idea of preferences in the preceding section of this opinion. And that is no accident, for the reasoning in

*Dean* echoes that of earlier opinions that looked to the intent of the parties to determine whether the transfer of security was either a preference or a payment for a contemporaneous debt. Many of those earlier opinions used the doctrine of equitable liens to find that a contemporaneous transfer existed in a bankruptcy case.

*Sexton v. Kessler & Co.*, 172 F. 535, 543 (2d Cir.1909)—the Court of Appeals decision in the case referred to in n. 25—exemplifies that approach. In *Sexton* an agreement for the transfer of stocks and bonds as security for borrowings against a line of credit had been entered into before the four-month statutory period, but the actual transfer took place during the period. Thus the issue for decision was whether the agreement itself "created a lien" (or a trust) so that the transfer related back to the time of the agreement. Judge Noyes' concurring opinion emphasized the creditor's equitable right in the securities, stating (*id.* at 543–44):

> The possession having been actually taken within four months of the bankruptcy, we now reach the decisive question whether it can be held to relate back to the time when the right to take possession was created—whether the act of taking possession created a lien, or merely enlarged and perfected an existing lien. And, in my opinion, in view of the equities between the parties and all the circumstances, such act should relate back to the creation of the right which it perfected, and the transfer be regarded as having taken place more than four months before the bankruptcy.
>
> \* \* \* \* \* \*
>
> The exercise of a pre-existing right well founded in equity is not a preference, although occurring within the prescribed period.[26]

---

**24.** Moreover, an era of financial distress such as the present unfortunately heightens the incidence of cases in which the *Dean* principle must be applied.

**25.** [Footnote by this Court] Among other sources, the Note cites in support of that proposition the decision in *Sexton v. Kessler & Co.*, 225 U.S. 90, 32 S.Ct. 657, 56 L.Ed. 995 (1912)—

the same case already referred to in the prior section of this opinion.

**26.** [Footnote by this Court] See also the opinion on the ultimate appeal in *Sexton*, 225 U.S. at 98–99, 32 S.Ct. at 659 (citation omitted), which reasoned:

> There can be no doubt, as was said by the court below, that before the bankruptcy the

Just as was true of the agreement in *Sexton*, the identification of collateral in the agreement between Bank and Pine Top was contained in more than one writing, and Bank's later receipt of the collateral occurred within the four-month period before the petition for rehabilitation of the insurance company and "after the stability of the [debtor was] in doubt" (*Sexton*, 225 U.S. at 96–97, 32 S.Ct. at 658–59 (taking the same approach as Judge Noyes below)). That factual parallel plainly calls for a parallel result.

■ After *In re Brass Kettle Restaurant, Inc.*, 790 F.2d 574, 575–76 (7th Cir. 1986) (applying Illinois law) there can be no doubt that the doctrine of equitable liens remains alive and well in the context of bankruptcy proceedings.[27] In the pre–1938 period, *Johnson v. Burke Manor Building Corp.*, 48 F.2d 1031, 1034 (7th Cir.1931) (citations omitted)—dealing with a situation in which a lender did not take possession of a promised security "until within four months of the filing of the petition in bankruptcy"—held that under Illinois law the delivery need not be contemporaneous with the contract, but rather relates back:

> It is the settled rule in bankruptcy that where a lien is good as between parties, but because of the lack of registration or possession not good against lien creditors, its registration, or in a proper case the taking of possession of the property

[creditor] had an equitable right at least to possession if it wanted it.... [W]e are of opinion that the agreement created such a lien at least, or in other words, that there is no rule of local or general law that takes from the transaction the effect it was intended to produce.

**27.** Century urges this Court to ignore Bank's equitable-lien argument because the agreement between Pine Top and Bank is governed by California's version of the UCC. But that argument (like so many made in this case) is only a red herring, for it rests on the notion that the California UCC negates the applicability of certain *statutory* liens of an equitable nature. However, as to the viability of *judicially* recognized equitable liens concurrently with the UCC, California law could not be more clear. Cal. Com.Code § 1103 (West 1964) (emphasis added) states:

> Unless displaced by the particular provisions of this code, the *principles of law and equity,*

before bankruptcy, will render it valid as against the trustee in bankruptcy, and will not be held to be the obtaining of a preference.

To the identical effect, 4 Pomeroy, *Treatise on Equity Jurisprudence* § 1235, at 696–98 (5th ed. 1941) (footnotes omitted) explains how such a lien is created:

> The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated.... [T]he doctrine itself is clearly an application of the maxim, equity regards as done that which ought to be done.

That proposition from Pomeroy was approved in *W.E. Erickson Construction, Inc. v. Congress–Kenilworth Corp.*, 132 Ill.App.3d 260, 269, 477 N.E.2d 513, 521 (1st Dist.1985) (citations omitted), *aff'd*, 115 Ill.2d 119, 104 Ill.Dec. 676, 503 N.E.2d 233 (1986), which explained that an equitable lien may arise either with or without an express agreement, but that (*id.* at 270, 477 N.E.2d at 521 (citations omitted)):

including ... the law relative to ... bankruptcy, ... *shall supplement its provisions.* *See, for example, T & O Mobile Homes v. United California Bank,* 40 Cal.3d 441, 448, 220 Cal. Rptr. 627, 632, 709 P.2d 430, 435 (1985), using equitable principles to settle a dispute over ownership of a mobile home, even though the defendant had properly secured its interest in UCC terms. *See also Cooper v. Union Bank,* 9 Cal.3d 371, 377 n. 5, 107 Cal.Rptr. 1, 5–6 n. 5, 507 P.2d 609, 613–14 n. 5 (1973), which in referring to Bankruptcy § 1103 stated that the general rule that a bank cannot charge its depositor for a forged indorsement is not changed by the UCC. Even more to the point for current purposes, *Cooper, id.* at 379 & n. 11, 107 Cal.Rptr. at 7–8 & n. 11, 507 P.2d at 615 & n. 11, 616 also used the doctrine of equitable liens to establish that the depositor has a lien on the proceeds of a deposited check, even though the UCC does *not* grant such a right.

In either case, the essential elements of an equitable lien are (1) a debt, duty or obligation owing by one person to another, and (2) a *res* to which that obligation fastens.

All parties agree that it was understood from the very beginning by Bank, Greyhound and Pine Top that the line of credit from which the LOC to Century was to be issued was to be fully secured. Furthermore, all three forms of collateral that Pine Top later assigned to Bank as security for its LOCs were identified (to a greater or lesser degree) before the actual issuance of the LOC—the point at which Pine Top first became potentially (and irrevocably) indebted to Bank.

First, the reinsurance recoverables were specifically identified in the commitment letter, which expressly stated that "Company agrees to assign to Bank all present and future reinsurance recoverable receivables as shown on the Company's books." And the commitment letter was accepted in writing on February 20 when Pine Top requested that Bank issue ten LOCs per the commitment letter.[28]

Second, the contemplated $3.2 million LOC was also adverted to in the commitment letter, which specified that "Company agrees to assign a minimum of $3.2 million in proceeds from a standby letter of credit which is to be issued to Company as beneficiary by Bank for the account of Greyhound Corporation." In fact there was another then-existing LOC in that amount, as to which Greyhound wrote to DOI on February 25 (Bank Ex. F):

> This letter of credit ... is currently pledged to the Bank of America as collateral for a letter of credit line in favor of Pine Top Insurance Company.

It is unnecessary to enter into the litigants' debate on the sufficiency of those documents to establish an equitable lien

(though Bank seems to have the better of the argument), given the already-discussed posture of the reinsurance recoverables.

Finally, the $6.8 million of short-term investments was spoken of both in the commitment letter's pledge that "Company and Subsidiary individually agree to pledge an aggregate minimum of $6.8 million in short term investments" and in Pine Top's February 19 letter representing to DOI (Herbst Ex. 5) [29] that it was using the Greyhound tax credit as collateral:

> [Greyhound has] given us support by advancing $10.0 million to Pine Top Insurance Company in 1985 Federal Tax credits. Of this amount, $3.2 million went into working cash and the balance is being used to collateralize a letter of credit at the Bank of America which Greyhound helped us to negotiate.

Then on February 24 Herbst wrote another letter to DOI (Bank Ex. E) confirming that provision of collateral to Bank:

> The letter of credit line will be in the amount of 10.0 million, against which approximately $6.8 million in securities would be pledged with the balance of collateral made up by the Greyhound letter of credit.

Once more this opinion need not explore the arcane mysteries of whether such a combination of documents does the job for equitable lien purposes (though once again Bank's position has substantial force), because the clear status of the reinsurance recoverables provides its own self-sufficient answer.

By the time Pine Top first became potentially indebted to Bank on February 26, then, ample collateral for security of that LOC (the reinsurance recoverables at a minimum, and likely the other two components as well) had been clearly identified for purposes of establishing an equitable lien. If Pine Top had not become insolvent

---

**28.** As explained in the prior section of this opinion, that alone would suffice to nail down the existence of an equitable lien for purposes of the current motion—once again, the amount of the receivables far exceeded the value of the LOC in dispute here. That means that the rest of the text discussion is unnecessary to the result and is therefore surplusage, but the other

two components of collateral will be spoken to briefly anyway.

**29.** Identification of the tax credit to a third person is sufficient to establish the equitable lien (*Johnson,* 48 F.2d at 1034 (citing Illinois law)).

Bank would have had every right as of February 26 to demand possession of the existing collateral in a court of equity.[30] Indeed, without a belief that it had some legal or equitable right to the collateral, Bank would not have issued the LOC to Century. On the flip side of the issue, without the issuance of the LOCs Bank would not have had any right to possession of the collateral—and no transfer of property (the alleged preference) would have occurred. All this plainly shows the essence of this transaction: not one in which Bank first became a creditor of Pine Top and then later took possession of collateral to provide security for repayment, but rather one in which Bank gave an LOC with the understanding that it was fully collateralized and that it was serving as a mere bridge for the transfer of funds to Century.

In short, it is clear from the undisputed facts in this case both (1) that Bank accepted the transfer of security substantially contemporaneously with the issuance of the LOC (per the *Dean* analysis) and (2) that until the actual transfer of that security it had an equitable lien on ample collateral that had been adequately identified before Bank's issuance of the LOC to Century. Each of those factors establishes independently that Bank did not receive a preference when, during the statutory four-month period, it took possession of the collateral from Pine Top. As *In re Compton Corp.*, 831 F.2d 586, 594 (5th Cir.1987) aptly stated, in distinguishing between an LOC issued contemporaneously (or in this case substantially contemporaneously) with the *new* extension of credit by the LOC beneficiary (the creditor) to the debtor—in which event there is *no* preference—and an LOC issued to secure *antecedent* unsecured debt due to the LOC beneficiary (the creditor) from the debtor—in which event there is an "indirect preference" to the beneficiary:

This result preserves the sanctity of letter of credit and carries out the purposes of the Bankruptcy Code by avoiding preferential transfer.... [T]he issuer of the letter of credit, being just the intermediary through which the preferential transfer was accomplished, completely falls out of the picture....

Bank "falls out of the picture" in this case as well, because its taking of security was a contemporary exchange for debt both at law and in equity.

3. *Reasonable Cause To Believe that a Preference Will Occur*

Even if the above analysis were not so clearly supported by the uncontroverted evidence, Bank has still another solid defense—a third and independent one—against the imposition of liability for accepting the transfer. Insurance § 816(2) provides a defense to any creditor who did not "have reasonable cause to believe that such a preference will occur." Interpreting the similar words of the old Bankruptcy Act,[31] Judge Learned Hand found that a creditor's taking of security when he was merely suspicious of the debtor's ability to pay was not a preference (*Sumner v. Parr*, 270 F. 675, 676–77 (D.S.D.N.Y.1919), *aff'd per curiam without opinion*, 270 F. 677 (2d Cir.1920)):

Finding his debtor unable to make ready payments, and knowing that she had substantial property, he became suspicious, and dissatisfied with delays, and took security. If this charges him with knowledge that the security will create a preference, then so is every creditor who takes security because he has become doubtful and suspicious of the eventual insolvency of his debtor. When the statute requires belief that a preference will result, it means more than this; for the taking of security only shows that the creditor has cause to believe that a preference might result. The two are very different. It may be the difference is

---

**30.** It should be noted that Bank could also establish an equitable lien for "property not yet in being at the time when the contract is made"—for example, the Greyhound LOC (4 Pomeroy § 1236, at 699–700 & n. 16).

**31.** Use of the words "will occur" in Insurance § 816(2) implies at least the same minimum level of knowledge as the words "would occur," which was the standard under the former Bankruptcy Act, 11 U.S.C. § 96(b) (1910).

only one of degree, but the statute establishes it none the less. In this case the proof goes no further than to show that it might.

Here Bank surely evidenced no knowledge that a preference would occur by its taking of security. This Court sees no more reason than did Judge Hand to apply Pine Top's suggested res ipsa loquitur approach.

To be sure, actual knowledge on Bank's part need not be shown. Bank would be vulnerable if it had reason to believe that Pine Top was insolvent (*Cunningham v. Brown*, 265 U.S. 1, 10–11, 44 S.Ct. 424, 426, 68 L.Ed. 873 (1924)). But no evidence suggests that. Pine Top attempts to bootstrap Bank into having notice of its insolvency by insisting that Bank had information available to it such that upon further investigation it would have discovered Pine Top's true financial condition. But as *Geeslin v. Blackhawk Heating & Plumbing Co.*, 80 Ill.App.3d 179, 184, 35 Ill.Dec. 226, 230, 398 N.E.2d 1176, 1180 (1st Dist.1979) teaches, without having some notice of insolvency a creditor has no independent duty to investigate the solvency of a debtor.[32]

In hindsight it may well be true that Bank could have discovered more than it did if it had launched a full-blown investigation. But that is not the correct test.[33] Having "reasonable cause to believe that such a preference will occur" refers to knowledge as seen from the perspective of the moment of the transfer of assets, not "with a knowledge of what an estate will pay out after it has undergone the shrinking process of the courts" (*W.S. Peck &*

Co. v. Whitmer, 231 F. 893, 897–98 (8th Cir.1916)).

Bank also asserts that it cannot be charged with a preference because it believed that Pine Top would stay in business and pay its debts with Greyhound's backing if necessary. That position is well supported both by the already-stated facts and by the law (*see, e.g., Geeslin*, 80 Ill.App.3d at 184, 398 N.E.2d at 1180). But even were that not so, it represents no more than a cumulative factor that is nonessential to Bank's success in this litigation.

\* \* \*

In sum, Bank is not liable to Pine Top for a preference by accepting the security for its issuance of the LOC to Century. Under both the doctrine of "substantially contemporaneous exchange" and the principles of equitable liens, Bank made a contemporaneous exchange for value and took no unlawful preference. Furthermore and independently, Bank had no reason to believe that it would receive a preference by its actions. Accordingly, Bank's motion for summary judgment is granted.

### Century's Summary Judgment Motion

Nearly 14 months after this Court rejected its first effort to get out from under the bulk of Pine Top's claim as a matter of law,[34] Century has launched a renewed motion for summary judgment against Pine Top. It is on no better paper now than before. Century repeats its chief argument that the indirect transfer of Pine Top's assets to Century did not create a

---

**32.** *Geeslin* was decided under Indiana law, but the court spoke in general law terms (indeed, the only case it cited in its analysis was one decided by Learned Hand as a federal district judge in New York), and there is no reason to believe that the Illinois court would not apply the identical standard under Illinois law. It would be most surprising if it did not.

**33.** Having said that, this Court acknowledges that this area of analysis is complicated by the current summary judgment posture of the case. All that Pine Top must now show is that there is a genuine issue of material fact as to whether Bank had reasonable cause to believe that a preference would result—and for that purpose Pine Top is entitled to the benefit of reasonable inferences from the facts of record. That piling

on of factors, each framed in "reasonableness" terms, attenuates Pine Top's burden far below one of actual *proof* of Bank's "cause to believe." But even if the result of that attenuation were to cast doubt on the ultimate conclusion stated in the text, Pine Top would still not rise like a Phoenix from the ashes of its having been destroyed by the other wholly unimpaired analysis in the earlier sections of this opinion.

**34.** As already stated, both Century's original motion and the current motion are targeted at only Count I of the two counts in which Century is named. Count II deals with the allegedly preferential nature of a much smaller transfer ($366,847.59) admittedly made by Pine Top directly to Century on June 17, 1986.

preference.[35] This Court finds no factual distinctions to cause it to alter the legal conclusions reached in the Opinion.

■ Indeed, Century offers nothing to support the propriety of advancing what boils down to a motion for reconsideration that appears to meet none of the limited-scope criteria for that type of motion (*Above the Belt, Inc. v. Mel Bohannan Roofing Co.*, 99 F.R.D. 99, 101 (E.D.Va. 1983)—and of asking for reconsideration on such a belated timetable at that. And as if that were not enough, Century misuses the summary judgment concept as well: It impermissibly seeks to hold back for another day at least two critical factual issues, one as to whether it had reasonable cause to believe that Pine Top was insolvent when Bank issued the LOC (Century Mem. 27 n. 13) and the other as to whether it reasonably believed that Pine Top would remain in business and pay all its debts (Century Mem. 29 n. 14).[36]

Under the circumstances this Court would be entirely within its rights to deny Century's motion out of hand. Even apart from the motion's failure to qualify as a proper motion for reconsideration, it is not a true all-or-nothing Rule 56 motion (which under Rule 56(c) must be decided if it is tendered). Instead it may more accurately be characterized as a one-way motion—dispositive if it is successful but nondispositive if it is unsuccessful.[37] That type of motion may more profitably be viewed as one under Rule 16. As such it would be entirely discretionary with this Court whether or not the motion should be entertained.

Despite that, this opinion will resist the entirely justifiable option of a one-sentence rejection of Century's motion in favor of a discussion of the motion's lack of substantive merit. That will necessarily involve some repetition of what has been said in the Opinion (just as Century has repeated much of what *it* argued the first time around).

■ At the outset, *In re Air Conditioning, Inc. of Stuart*, 845 F.2d 293, 296–97 (11th Cir.1988) and *Compton*, 831 F.2d at 594–95 make it clear that a creditor cannot avoid preference liability by receiving an

---

**35.** Although Century's memorandum is captioned as both one in opposition to Bank's motion and one in support of its own motion for summary judgment, its central thrust from the outset is an argument to support Century's own motion.

**36.** This Court has frequently pointed out that the Rule 56 motion is supposed to be a substitute for trial—a litigant's assertion that no trial is necessary in the evidentiary sense because no factual disputes exist or because any that do exist are non-material (that is, non-outcome-determinative) (see, e.g., the Appendix to this Court's opinion in *Teamsters Local 282 Pension Trust Fund v. Angelos*, 649 F.Supp. 1242, 1252 (N.D.Ill.1986)). And that "no-holding-back" concept has found a friendly echo in our Court of Appeals at least as to the nonmovant under Rule 56 (*see, e.g., Publishers Resource v. Walker-Davis Publications*, 762 F.2d 557, 561 (7th Cir. 1985), quoting this Court's opinion in *Keene Corp. v. International Fidelity Ins. Co.*, 561 F.Supp. 656, 665–66 (N.D.Ill.1982), *aff'd and adopted*, 736 F.2d 388, 393 (7th Cir.1984)). To be sure, the risk to a Rule 56 movant such as Century of having held back evidence (if it had any) on critical issues that it failed to confront on its motion "is not well defined" (*Teamsters Fund*, 649 F.Supp. at 1252–53 and cases cited there). Absent a cross-motion for summary judgment by the opposing party (and there has been none here), there has been no *express*

notice to the movant that it is a matter of "speak now or forever hold your peace"—so the question becomes whether the inherent nature of Rule 56, plus the concededly more limited discussion of this problem in the reported cases, is enough to deny a litigant such as Century a second (or in this instance a third) bite at the apple. At a minimum it would seem that even if Century is not actually foreclosed from its holdback approach, it should be subject to an affirmative obligation to show its cards this far along in this lawsuit. That among other matters will be dealt with at the next status hearing scheduled at the conclusion of this opinion.

**37.** Among other problems posed by such a motion, if the movant prevails before the District Court but that decision is reversed on appeal, the case must be remanded for a full-blown trial on the merits. That of course creates the potential for multiple appeals, a prospect that is quite properly of concern to the appellate courts. Conversely, if there is no holding back of evidence and issues before the trial court, the appellate review of the District Court's resolution of a Rule 56 motion is most likely to mean the end of the case whether the Court of Appeals agrees or disagrees with the District Court's result—hence the spectre of piecemeal appeals vanishes.

indirect payment through a financial mechanism such as a LOC rather than via direct payment from the debtor. On that score the holding in *Compton, id.* (quoted and followed in *Air Conditioning,* 845 F.2d at 297 n. 3) could not be more plain:

> We hold that a creditor cannot secure payment of an unsecured antecedent debt through a letter of credit transaction when it could not do so through any other type of transaction. The purpose of the letter of credit transaction in this case was to secure payment of an unsecured antecedent debt for the benefit of an unsecured creditor. The promised transfer of pledged collateral induced the bank to issue the letter of credit in favor of the creditor. The increased security interest held by the bank clearly benefitted the creditor because the bank would not have issued the letter of credit without this security. A secured creditor was substituted for an unsecured creditor to the detriment of other unsecured creditors.

■ Though Century has tendered some additional facts .in this second summary judgment motion, those facts (like the facts initially considered in the Opinion) firmly support a finding that Pine Top has presented considerably more than a prima facie case that Century did in fact receive a preference under the guise of an indirect transfer. Pine Top was already indebted to Century for approximately $2.9 million. To secure that debt Pine Top arranged for Bank to issue an LOC—one that this opinion has already found was always intended to be collateralized by Pine Top. Century then drew on the LOC and received full payment on its claim against Pine Top. As Opinion at 315 said:

> Those things being true, Century should be precluded from receiving a greater percentage of its claim than other creditors.[38]

Century's attack on the *Compton–Air Conditioning* application of the indirect transfer concept to LOC situations such as this one fails entirely.

### 1. *Century's Defenses*

In addition to a renewal of its legal argument regarding its indirect transfer, Century raises two supposed defenses:

> 1. It did not know that the LOC was fully collateralized.
> 2. It believed that Pine Top would resurface from its financial difficulties in order to pay its creditors in full.

As discussed below, neither of those contentions runs in Century's favor as a matter of law on the record before this Court.

■ Century argues that it escapes liability because it had no reason to know that its action would cause a preference. As Opinion at 316 discussed, reasonable cause to believe that a preference will occur exists when the creditor has reasonable cause to believe that the debtor is insolvent (*Cunningham,* 265 U.S. at 10–11, 44 S.Ct. at 426). There is no evidence at all to negate Century's having had notice of Pine Top's insolvency, as amply supported by the evidence set out in the penultimate paragraph of the "Facts" section.[39] Once it appears

---

**38.** [Footnote by the Court] This Court did not then ultimately resolve this issue in favor of Pine Top because, as Opinion at 315 n. 9 said:

> Because all the facts are not before this Court on the present motion, this opinion should not be misread as a holding that Pine Top would necessarily be entitled to a summary judgment against Century.

Lest there be any question as to why this Court entertained Century's earlier motion in the Opinion, given the fact that it too was wanting in the respect described in n. 36, it should be pointed out that at that earlier stage of the proceedings Century had filed what was labeled a combined Rule 12(b)(6) motion (testing Pine Top's Complaint in facial terms) and Rule 56(b) motion (with limited factual supplementation).

Because the Rule 12(b)(6) motion had to be addressed in all events, this Court took the few added facts submitted by Century into account to show that they would make no difference in terms of guaranteeing victory to Century (see Opinion at 312 n. 3), rather than this Court's ignoring them entirely as it might well have done. But as said earlier, that does not justify Century in filing still another motion to cover the same ground with some—but not all, as it says—of the added facts.

**39.** .Century's Mem. 27 n. 13 says:

> Although Century denies that it had reasonable cause to believe that Pine Top was insolvent at the time the Bank issued the letter of credit, for purposes of this motion, Century will not contest that issue.

that Century had reason to know of Pine Top's insolvency, a presumption arises in Pine Top's favor that a preference occurred when Century then received payment on its debt. Harper, *Presumptions Affecting the Recovery of Preferences by Trustee in Bankruptcy*, 1 S.Cal.L.Rev. 444, 458 (1927–28) explains in that situation:

> [A] presumption arises which demands, as a matter of law, a finding that the creditor had reasonable grounds to believe that a preference would be effected, if it can be shown that the creditor at the time either had knowledge of the insolvency or had knowledge of facts sufficient to put a reasonable man on notice, unless the creditor can show that he had grounds to believe, as a reasonable man, that the other creditors would get as much in payment of their claims. All the other elements being present, the burden of proof, of course, is upon the creditor to show the latter situation.

What Century urges is that the two requirements of the creditor's reasonable grounds to believe—one as to the debtor's insolvency and the other as to the creditor's receipt of a preference when it was paid—are severable and demand separate and independent proof. But even assuming that to be true,[40] it is Century's next step that is untenable: It proposes that it

cannot be held liable for receiving a preference if it cannot be shown that it knew that the LOC was fully collateralized. That approach would impermissibly shift the burden of proof from Century's shoulders. There is simply no support in the statute or case law for the proposition that Century must be proved to have known the source of the payment from the LOC. Any such scienter requirement would undermine not only the purpose of the statute but also the entire indirect-transfer analysis in the *Compton* and *Air Conditioning* cases. It need only be repeated that those cases teach that the LOC (the transfer of value) is treated as having come from the *debtor* (here Pine Top) directly to the creditor (here Century).[41]

That being true, the effect of the presumption that stems from the creditor's having had reasonable cause to believe in the debtor's insolvency is that the *creditor* has the burden of offering evidence that it did *not* have reason to believe that it was getting a preference—more than its aliquot share of the debtor's assets. Century's position would turn the presumption on its head. Its total silence on the issue of reason to believe causes it to lose, just as every legal presumption causes the party opposing it to lose if neither side offers evidence on the question at issue.[42]

But Rule 56 motions are fact-bound by their very nature. It simply will not do for a defendant to "deny," via its brief, the existence of a fact that is fatal to its defense and is supported by evidence tendered by the plaintiff. This opinion will conclude by addressing just what should be done in view of Century's current failure.

**40.** Century cites three cases in support of its theory. But one of those cases, *Charlesworth v. Hipsh, Inc.*, 84 F.2d 834, 837 (8th Cir.1936) involved a debtor that was *solvent* when the alleged preferential payment was made, so that the second element (no reasonable ground to believe insolvency) was icing on the cake—dictum. As for the second case, *Irving Trust Co. v. Townsend*, 65 F.2d 406, 409 (2d Cir.1933), there the creditor was found to have believed honestly that he was receiving his fair share of payment—in fact, likely *less* money than he would have received as a dividend in bankruptcy. And the third case, *Patrick v. Rice*, 98 F.2d 550 (3d Cir.1938), deals only with an evidentiary issue and is inapposite. Despite the paucity and limited utility of the authority advanced by Centu-

ry, however, this opinion will assume that the creditor's reasonable ground to believe that it was receiving a preference does represent an independent component of preference liability.

**41.** This Court notes parenthetically that Judge Leinenweber's opinion referred to in n. 3 finds the identical argument, also advanced by the creditor in that case, equally untenable. Indeed, Judge Leinenweber gives the argument even shorter shrift (at 288–89).

**42.** As is true of interpretive principles in the law of contracts (*Continental Casualty Co. v. Pittsburgh Corning Corp.*, 917 F.2d 297, 300 (7th Cir.)), presumptions simply play the role of tiebreakers—controlling the result in the absence of proof. It is scarcely necessary to add that it is a bizarre notion indeed to suggest—in the total absence of any proof—that a creditor such as Century, which received 100 cents on the dollar via an LOC treated as having come from the debtor, did *not* get a greater percentage than the other creditors of an insolvent debtor such as Pine Top.

Finally, it is true that Century's last asserted defense, that it believed that Pine Top would remain in business and pay all its debts, is on sound legal footing. For example, *Geeslin*, 80 Ill.App.3d at 184, 398 N.E.2d at 1180 adopted that concept as a matter of Indiana law, quoting the statement from Learned Hand's opinion in *Kennard v. Behrer*, 270 F. 661, 663–64 (D.S.D. N.Y.1920):

> That creditor only the statute proscribes who dips his hand in a pot which he knows will not go around. Hence it follows that, while there is an honest chance of continued life, he need not quench it at his own peril. The only test is the honesty of his purpose.

But Century's problem is once again that it has offered nothing to support the idea that it had any such honest purpose. Merely saying so is not enough. There must be some objective predicate to underpin an inference that, despite Century's knowledge of the weak financial condition of Pine Top, it reasonably thought that it could take 100% payment on its own debt with an honest belief that other creditors also would get full payment on their claims.[43] On its face that seems to defy probability—but once more Century has failed even to try to garner evidentiary support (Century Mem. 29 n. 14).

* * *

In light of the just-concluded discussion, it is really an understatement to say that Century loses on its renewed summary judgment motion. If Pine Top had thought to counter with a cross-motion of its own, this case would most likely be over.[44] Neither this Court nor Century's adversary would have been burdened with this second dry run.

That leaves for consideration what ought to be done under the circumstances. This Court (like others) has not been diffident under comparable circumstances about exacting an appropriate price for the extra effort thrust on the opposing litigant (*see, e.g., SFM Corp. v. Sundstrand Corp.*, 102 F.R.D. 555 (N.D.Ill.1984)). But that does not really advance the system—it does not compensate for the needless and gratuitous burden thrust on this Court, which is not a designated beneficiary of any such prophylactic provision as Rule 11 or 28 U.S.C. § 1927.

No obvious answer suggests itself. At a minimum, however, the goal of efficient judicial administration demands that at the next status hearing (1) Century's counsel must come prepared to identify what matters, consistent with the objective good faith commanded by Rule 11, Century can proffer to support its position on the two withheld factual issues discussed in this opinion and (2) Pine Top's counsel should come prepared to discuss the most expeditious way of putting this case into a posture for final resolution.

### Conclusion

There are no genuine issues of material fact as to Pine Top's claim against Bank, and Bank is entitled to a judgment as a matter of law. There has been no discussion by the parties as to the potential application of Rule 54 to that claim (*see, e.g., National Metalcrafters v. McNeil*, 784 F.2d 817, 821 (7th Cir.1986)), and they should be prepared to address that question at the next status hearing at 9 a.m. on December 4, 1990.

Century's renewed motion for summary judgment on Count I is denied. At the December 4 status hearing the parties will be expected to treat with the anticipated future proceedings in this action.

---

[43] *See, e.g., W.S. Peck*, 231 F. at 897 (creditor took partial payment with an honest belief that the other creditors would get the same share).

[44] It is of course possible that Century has evidence on one or both of the two issues on which it has held back that would suffice to raise a genuine factual issue and thus stave off summary judgment in Pine Top's favor on Count I. But if it does, this Court is frankly at a loss to understand what would cause Century to hold back in the first place. And it certainly seems likely that Century's failure to seek summary judgment on the lesser Count II indicates that it recognizes it is even weaker there.